UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

G.S., by and through his parents and next
friends, BRITTANY AND RYAN SCHWAIGERT;
S.T., by and through her mother and next friend,
EMILY TREMEL; and on behalf of those
similarly situated,

    Plaintiffs,

v.                                                                                             Case No. 21-2552

GOVERNOR BILL LEE, in his official
capacity as GOVERNOR OF TENNESSEE,
SHELBY COUNTY, TENNESSEE,

    Defendants.

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**INTRODUCTION**

    Plaintiffs are minor children who attend K-12 public schools in Shelby County, Tennessee. They are minor children who suffer from disabilities—conditions and/or disorders that place them at higher risk for severe illness or death from COVID-19.  As a result of Defendant Governor Bill Lee's executive order allowing parents to opt their children out of the county-wide mask mandate, Plaintiffs and their parents are left with the impossible decision of whether to withdraw from in-person classes and receive a less than full and adequate education when compared to their non-disabled classmates or to risk their health and safety and remain in class.

    COVID-19 presents an immediate and unprecedented threat to Plaintiffs and to the Class members they represent.  COVID-19 has spread and continues to spread quickly in their schools and within Shelby County, and Governor Lee's Executive Order undermining the universal mask

mandate issued by Defendant Shelby County, Tennessee has led to heightened risk of infection and quarantine. **As Defendant Governor Bill Lee admitted, "If you want to protect your kid from the [COVID-19] virus or from quarantine, the best way to do that is to have your kid in school with a mask."**[1] Despite this knowledge, he has withdrawn this protection from students with disabilities and placed them in significant danger. Without intervention, Defendant Lee's executive order will place more students with disabilities in real danger of severe infection and death as well as continue the spread of the virus to the community at large. Enjoining Defendant Lee's Executive Order, however, will cause no harm and will only benefit the public at-large.

For these reasons, and for the reasons explained further below, the Court should grant Plaintiffs' Motion.

## I. FACTS

### A. Plaintiffs and the Class Members Are at High Risk of Severe Illness or Death from COVID-19.

The CDC has provided a non-exhaustive list of factors that put people at high risk of severe illness or death from COVID-19.[2] While children in general are believed to be at less risk than adults from severe outcomes from COVID-19, children with these conditions and disorders are at significantly higher risk than their classmates who do not have the same disabilities.[3] Plaintiffs and the Class and Subclass they seek to represent are K-12 students in Shelby County public

---

[1] https://apnews.com/article/health-coronavirus-pandemic-tennessee-32b7ff0dc540a2b11cc8c736c67020fe

[2] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#ChildrenAndTeens ("Current evidence suggests that children with medical complexity, with genetic, neurologic, metabolic conditions, or with congenital heart disease can be at increased risk for severe illness from COVID-19. Similar to adults, children with obesity, diabetes, asthma or chronic lung disease, sickle cell disease, or immunosuppression can also be at increased risk for severe illness from COVID-19.")

[3] Id.

schools who are at high risk of severe illness or death if they contract COVID-19 due to their disabilities.

**Plaintiff G.S.** is a thirteen-year-old boy who is autistic and suffers from Tuberous Sclerosis Complex, which is a genetic disorder that causes polycystic kidney disease, epilepsy, and hypertension. (Declaration of Brittany Schwaigert, "Schwaigert Decl." ¶ 2). G.S. takes a daily regimen of chemotherapy to control the growth of his brain tubers and kidney cysts. The chemotherapy regimen compromises his immune system. (Id. ¶ 3). While he has been vaccinated, due to his compromised immune system, it is not clear the level of protection that the vaccine will provide him. (Id. ¶ 4). G.S. attends West Middle School in Collierville, Tennessee. (Id. ¶ 5). He is at high risk for severe complications if he contracts COVID-19, which could cause renal failure or could trigger a seizure resulting in his death. (Id. ¶ 6). Because of his autism, G.S. is not capable of wearing a mask at all times while in public and in the classroom. As such, he relies on others wearing masks to reduce the risk of his infection with COVID-19. (Id. ¶ 7). G.S. is not capable of receiving an equal education through virtual learning because of his autism, his need for socialization and play with children his own age, and the difficulties of administering therapies virtually. (Id. ¶ 8).

**Plaintiff S.T.** is an eleven-year-old girl who suffers from a chromosomal abnormality that results in episodic ataxia and congenital nystagmus. (Declaration of Emily Tremel, "Tremel Decl." ¶ 2). She is not yet eligible to receive a COVID-19 vaccine. S.T. attends Houston Middle School. (Id. ¶ 3). S.T. is at-risk of severe complications from COVID-19 due to her disability. Specifically, a rise in body temperature through a fever could cause an extreme ataxic episode where she is unable to stand or sit up and has difficulty talking. (Id. ¶¶ 5-6). S.T. attempted virtual learning last

year, but it was difficult as the required screen use resulted in increased visual fatigue and more frequent ataxic episodes. (Id. ¶ 7).

### B. School-aged Children with Disabilities Face an Imminent Risk of Substantial Bodily Harm

The danger of COVID-19 to Plaintiffs and other Class members who have disabilities is increasingly acute in schools. Children are now 36% of all COVID-19 cases in Tennessee.[4] Since June 29, 2021, the State of Tennessee has seen a dramatic rise in the increase of COVID-19 cases, mostly driven by the rapid spread of the Delta variant. For example, on June 29, 2021, Tennessee had an average positive test rate for COVID-19 of 1.9%. As of August 17, 2021, that average positive test rate had grown to 40.14%.[5] In that same time period, the average daily cases per 100,000 people in Tennessee has grown from 1 to 62.[6]

Like the rest of Tennessee, Shelby County has suffered from the spread of the COVID-19 Delta variant. On June 15, 2021, the seven-day average of positive cases was only 27.[7] As of August 18, 2021, Shelby County had a seven-day average of 730 new daily cases with a positivity rate of 21.5% for the week ending on August 14, 2021.[8] This was the highest positive rate since the inception of the pandemic.[9]

---

[4] https://apnews.com/article/health-coronavirus-pandemic-tennessee-32b7ff0dc540a2b11cc8c736c67020fe

[5] https://www.mayoclinic.org/coronavirus-covid-19/map/tennessee

[6] Id.

[7] Shelby County Health Department, COVID-19 Data Dashboard, https://insight.livestories.com/s/v2/1-2-case-counts/c4f65175-2433-47b7-b112-d62cf719af71

[8] Id.

[9] Id.

COVID-19 is most commonly transmitted by small viral particles (droplets) exhaled by an infected person that are deposited into the nose, mouth and/or eyes of an uninfected person. (Declaration of Sara Cross, MD, "Dr. Cross Decl." ¶11).  This means COVID-19 spreads to an uninfected person when an infected person – including asymptomatic (no symptoms) – speaks, coughs, or sneezes. People with COVID-19 have reported a wide range of symptoms, ranging from no or mild symptoms to severe illness. COVID-19 may cause severe and long-term health complications, including death. (Declaration of Joi Wilson-Townsend, M.D., "Dr. Wilson-Townsend Decl." ¶ 8; Dr. Cross Decl. ¶ 17).  Underlying medical conditions are associated with severe COVID-19 illness in children, specifically obesity, type I Diabetes millitus, prematurity and cardiac and congenital abnormalities.  (Dr. Cross Decl. ¶ 15).

COVID-19 can spread quickly. In-person gatherings pose a heightened risk of transmission of COVID-19 as the spread of COVID-19 is more likely when people are in close contact or proximity with one another (within about six feet). The risk of transmission also increases when individuals gather in close proximity for extended periods, and when they do so in enclosed (indoor) spaces. (Dr. Cross Decl. ¶ 11).  An infected person who is unmasked will infect 7 others and individuals are infectious or up to 48 hours prior to symptom onset so they will not know to self-isolate during this period.  (Dr. Cross Decl. ¶ 14).

The consensus by the Centers for Disease Control and Prevention (CDC), the World Health Organization (WHO) and other infectious disease experts is that the only way to limit illness and death from COVID-19 until a larger proportion of the population has been vaccinated is through a combination of measures, including: individual behaviors such as wearing masks, maintaining physical distance from others, washing hands and completely avoiding contact with others when ill; widespread testing with isolation of cases and quarantine of close contacts; and community

5

social distancing measures. (Dr. Wilson-Townsend Decl. ¶ 10; Dr. Cross Decl. ¶ 13). Masks are effective in mitigating the spread of COVID-19. (Dr. Cross Decl. ¶ 12). Scientific research has produced experimental, epidemiological, and modeling evidence demonstrating the efficacy of masks in mitigating transmission of COVID. (Cross Decl. ¶¶ 12-14). The use of masks is associated with a large reduction in risk of infection (17% risk of infection in unmasked individuals versus 3% risk of infection in masked individuals). (Dr. Cross Decl. ¶ 12). Universal masking has been shown to reduce transmission of COVID-19 by 79% when individuals are in close contact indoors with an infected individual. (Dr. Cross. Decl. ¶ 12).

Meanwhile, all children benefit from in-person school. The American Academy of Pediatrics finds that in-person learning is particularly important for educating young children in the pre-school and elementary school grades and students with disabilities as they are less likely to adapt to remote learning and more likely to require significant parental supervision. (Dr. Wilson-Townsend Decl. ¶ 22).

Because of the importance of in-person learning, especially for children with disabilities, it is critical that we take all steps reasonably available to mitigate the risk of COVID-19 transmission. (Dr. Wilson-Townsend Decl. ¶ 23). Those steps specifically include wearing masks as requiring individuals to wear a mask over their nose or mouth in school limits the spread of the virus by the wearer and also provides protection for the wearer. (Dr. Wilson-Townsend Decl. ¶¶ 26-28; Cross Decl. ¶¶ 12-14). Requiring all students to be masked is especially important when individuals with disabilities are unable to wear masks due to their disabilities. In other words, they rely on their classmates and teachers to protect them by wearing their own masks. (Dr. Wilson-Townsend Decl. ¶ 27). Thus, to maximize the ability of children with and without disabilities to

attend in-person school in the safest manner possible, it is important that all students and staff wear masks and not be able to opt-out.  (Dr. Wilson-Townsend Decl. ¶¶ 29-30; Cross Decl. ¶¶ 12-14).

## II. ARGUMENT

Plaintiffs meet the legal requirements for the Court to grant them a temporary restraining order and preliminary injunction.  As explained below, (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm in the absence of relief; (3) the issuance of the injunction would not cause harm to others; and (4) a TRO/injunction is in the public interest. Williamson v. Recovery Ltd. P'ship, 731 F.3d 608, 627 (6th Cir. 2013) (quoting Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati, 363 F.3d 427, 432 (6th Cir. 2004)).   Where plaintiffs demonstrate "irreparable harm which decidedly outweighs any potential harm to the defendant," the "degree of likelihood of success required" is less, and a plaintiff need only raise "serious questions going to the merits."  In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985).

### A.    **Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

Plaintiffs are likely to establish that Defendant Gov. Bill Lee has violated their rights under the ADA and Section 504 of the Rehabilitation Act.  Section 504 of the Rehabilitation Act is an antidiscrimination statute that provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Like Section 504, Title II of the Americans with Disability Act ("ADA") is also an antidiscrimination statute and provides:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Excluding children from the public-school classrooms on the basis of their disability is precisely the type of discrimination and segregation the ADA and its amendments aim to prevent and specifically prohibit. Rehabilitation Act and ADA claims "share the same standard" and Rehabilitation Act claims are reviewed as though brought under the ADA. Zibbell v. Mich. Dep't of Human Servs., 313 F. App'x 843, 849 (6th Cir. 2009). Both the ADA and the Rehabilitation Act require Plaintiffs to establish that: (1) Plaintiffs are qualified individuals with a disability within the meaning of Section 504 of the Rehabilitation Act or the ADA; (2) Plaintiffs will be "excluded from participation in" or "denied benefits of" such "services, programs, or activities of the public entity," and (3) Plaintiffs' exclusion, denial of benefits, or discrimination occurred "by reason of" their disability. Keller v. Chippewa Cty., 2021 U.S. App. LEXIS 17839, at *10 (6th Cir. June 14, 2021).

In this matter, Plaintiffs will likely prevail on the merits because they are qualified individuals with disabilities under the ADA and Section 504, a Governor's mask opt-out order has the effect of excluding these children from school activities with other children, or otherwise denying them the opportunity to participate in the services of the school district because they will either have to stay at home to guarantee their health and safety, or expose themselves to serious risk of illness or death by appearing for in-person classes in the absence of basic COVID-19 prevention strategies.

Governor Lee's Executive Order specifically violates the regulations and provisions of the ADA and Section 504, and/or cause Plaintiff's school districts to violate the regulations and provisions of the ADA and Section 504 in the following ways:

    1.    Defendant is failing to make a reasonable modification, and/or are preventing Plaintiffs' school districts from making a reasonable modification, under circumstances where it is required, in violation of 28 C.F.R. § 35.130(b)(7);

    2.    Defendant is excluding and/or are causing Plaintiffs' school districts to exclude Plaintiffs from participation in public education, in violation of 42 U.S.C. § 12132; 28 C.F.R. § 35.130; 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i);

    3.    Defendant is failing to make and/or causing Plaintiffs' school districts to fail to make, their services, programs, and activities "readily accessible" to disabled individuals, in violation of 28 C.F.R. § 35.150;

    4.    Defendant is administering a policy that has the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability and that has the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities, in violation of 28 C.F.R. § 35.130(b)(3)) and 34 C.F.R. § 104.4(b)(4).

    5.    Defendant is using methods of administration that have the effect of subjecting Plaintiffs to discrimination on the basis of disability, in violation of 34 C.F.R. § 104.4(b)(4);

Although all school children, particularly those under age 12 who are ineligible to receive the vaccine, face an increased risk of contracting COVID-19 in the absence of a mask mandate, students with certain medical disabilities will be significantly more impacted without this basic protection. Plaintiffs and the Class and Subclass they represent have medical disabilities that have been shown to put them at greater risk for being hospitalized, becoming severely ill, or dying as a result of COVID-19.  If they contract COVID-19, each of these Plaintiffs are at a high risk of significant complications such as severe illness, long-lasting disability, and death.

    **B.**    **Plaintiffs' Risk of Exposure to COVID-19 and/or Withdrawal from In-Person Classes Constitutes Irreparable Harm.**

Plaintiffs are likely to suffer irreparable and substantial harm if Governor Lee's Executive Order No. 84 remains in place.  Plaintiffs must show that "irreparable injury is likely in the absence of an injunction." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). A harm need not be inevitable or have already happened for it to be irreparable; rather, imminent harm is also cognizable harm that merits an injunction. See Helling v. McKinney, 509 U.S. 25, 33 (1993).

Plaintiffs are likely to suffer probable, irreparable injury if the Governor's Executive Order remains in place because school has been in session for more than 3 weeks, a significant number of the student body has already opted-out of the county-wide mask mandate, and the number of students infected with COVID-19 or exposed, warranting quarantine continues to rise. As Dr. Cross states in her declaration, "One unmasked infected child could potentially lead to 7 new infections." (Cross Decl. ¶ 18). Dr. Cross uses Houston Middle School as an example as it has a 22% opt out rate and has already had 27 student cases of COVID in just over 2 weeks. She also states that Marion School District, which began on July 26 with no mask mandate, and had 93 students by August 11, 2021. (Cross Decl. ¶ 19). In fact, Plaintiff S.T. has already tested positive after learning that an unmasked classmate was absent from school after testing positive for COVID-19. S.T. and her mother, of course, upon a hopeful recovery by S.T. will again face the decision of whether to return in person for schooling or risk recontracting COVID-19 when exposed to her unmasked classmates.

Without the ability to implement a universal mask mandate, Plaintiffs will continue to be exposed to an increased risk of infection, hospitalization, or death because of COVID-19, or they will be forced to stay home and denied the benefits of an in-person public education. Further, Plaintiffs struggled in remote learning last year and were unable to thrive in the same way that they do in an in-person setting.

Plaintiffs are particularly vulnerable to the virus both because of their medical conditions, the fact that the Subclass remains ineligible to receive the vaccine due to being under the age of 12 years old, or that the efficacy of the vaccine is reduced due to their compromised immune systems. Frankly, it would be unconscionable to argue that exposure to virus that cause severe ramifications including death is not an irreparable harm incapable of being adequately remedied

at law with money damages. Peregrino Guevara v. Witte, No. 6:20-CV-01200, 2020 WL 6940814, at *8 (W.D. La. Nov. 17, 2020) (noting that "[i]t is difficult to dispute that an elevated risk of contracting COVID-19 poses a threat of irreparable harm"); Banks v. Booth, 2020 U.S. Dist. LEXIS 68287, at *45 (D.D.C. Apr. 19, 2020) (in granting an injunction the court found "that the number of inmates testing positive for COVID-19 is growing daily. Given the gravity of Plaintiffs' asserted injury, as well as the permanence of death, the Court finds that Plaintiffs have satisfied the requirement of facing irreparable harm unless injunctive relief is granted."); Thakker v. Doll, 451 F. Supp. 3d 358, 365 (M.D. Pa. 2020) (in granting an injunction to release petitioners in civil detention who suffered from "chronic medical conditions and face[d] an imminent risk of death or serious injury if exposed to COVID-19," court determined that "[t]here [could] be no injury more irreparable" than the "very real risk of serious, lasting illness or death"); Basank v. Decker, No. 20 CIV. 2518 (AT), 2020 WL 1953847, at *7 (S.D.N.Y. Apr. 23, 2020) (in granting an injunction to prevent placing petitioners in immigration detention, court noted that "[p]etitioners [were] at particular risk for serious illness or death, because their preexisting medical conditions either [made] them more vulnerable to contracting COVID-19, or more likely to develop serious complications due to COVID-19, or both" and the possibility of a severe, and "quite possibly fatal" infection constituted irreparable harm that warranted a preliminary injunction).  Accordingly, the Court should find that Plaintiffs have met their standard and demonstrated the substantial likelihood of irreparable harm.

      **C.**      **There is No Hardship to Defendants and the Public Interest Favors Plaintiffs.**

When the government opposes the issuance of a temporary restraining order, the final two factors—the balance of the equities and the public interest—merge. See Nken v. Holder, 556 U.S. 418, 435 (2009).  The public has an interest in protecting public health.  See Neinast v. Bd. of Trs. of the Columbus Metro. Library, 346 F.3d 585, 594 (6th Cir. 2003) (recognizing public health and

11

safety as legitimate government interests). The public interest is also "served by the enforcement of the ADA." Wilborn ex rel. Wilborn v. Martin, 965 F. Supp. 2d 834, 848 (M.D. Tenn. 2013). The public interest thus requires that a TRO be granted in order to effectuate the ADA's broad "remedial purposes." Hostettler v. College of Wooster, 895 F.3d 844, 853 (6th Cir. 2018).

Moreover, no harm or hardship shall be suffered by Defendants. As Gov. Lee himself has affirmed that masking is the single best way to protect children at school from infection with COVID-19. Enjoining Governor Lee's Executive Order will cause no harm other than the potential dissatisfaction of some members of the public. Further, ordering Defendant Shelby County to enforce the mask mandate will benefit the County and the public by reducing the risk of the spread of COVID-19 in schools and among its children. It also has the benefits of reducing the stress faced by local hospitals like Le Bonheur Children's Hospital in treating unnecessarily infected children.

### III. CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion. Plaintiffs ask for a hearing on this request for TRO based on the written brief and attached declarations on Monday, August 30, 2021.

Plaintiffs have provided notice of this motion and the relief sought by hand delivery and email as well as telephone call to the Tennessee Attorney General's Office and the Shelby County Attorney's Office.

Respectfully Submitted,

**DONATI LAW, PLLC**

/s/Bryce W. Ashby
Bryce W. Ashby—TN Bar #26179
Brice M. Timmons—TN Bar #29582
Robert A. Donati—TN Bar #25355
Craig A. Edgington -—TN Bar #38205
1545 Union Avenue
Memphis, TN 38104
Phone: 901.278.1004
Fax: 901.278.311
Email:
bryce@donatilaw.com
robert@donatilaw.com
brice@donatilaw.com
craig@donatilaw.com

*Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

A copy of the foregoing was served on Counsel for Defendants along with a copy of the Complaint and Summons as well as by email to provide proper notice pursuant to Rule 65 on this the 27th day of August, 2021.

/s/Bryce W. Ashby