**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| G.S. by and through his parents and next friends, BRITTANY and RYAN SCHWAIGERT, *et al.*, | Case No. 2:21-cv-02552-SHL-atc |
| *Plaintiffs*, | |
| v. | |
| GOVERNOR BILL LEE, *et al.*, | |
| *Defendants*. | |

**BRIEF OF *AMICI CURIAE* TENNESSEE CHAPTER OF THE AMERICAN ACADEMY OF PEDIATRICS AND AMERICAN ACADEMY OF PEDIATRICS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## INTEREST OF *AMICI CURIAE*[1]

The Tennessee Chapter of the American Academy of Pediatrics ("TNAAP") is a non-profit educational organization and professional society comprising more than 1,000 members including pediatricians, residents, and medical students from Tennessee's hospitals, community clinics, and school-based health centers. TNAAP promotes the optimal health and development of children and adolescents of Tennessee, in partnership with their families and communities, and supports the pediatricians who care for them.

The American Academy of Pediatrics ("AAP") was founded in 1930 and is a national, not-for-profit professional organization dedicated to furthering the interests of child and adolescent health. The AAP's membership includes over 67,000 primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists. Over the past year and a half, the AAP has devoted substantial resources to researching the scientific literature regarding how to treat COVID-19 and reduce its spread so that the AAP can provide up-to-date, evidence-based guidance for pediatricians and public health officials. This includes, among other things, interim guidance on the use of face masks as an infection control measure and on operating safe schools during the COVID-19 pandemic.

## INTRODUCTION

The public interest is a paramount consideration in adjudicating Plaintiffs' motion for a preliminary injunction. As the Supreme Court has explained, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Here, there is no question about where

---

[1] *Amici* certify that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than *Amici*, their members, and their counsel contributed money intended to fund this brief.

the public interest points. Indeed, the issue is so clear that Defendant's brief does not even attempt to deny that the balance of the equities and the public interest weigh in favor of an injunction.

Over the past 18 months, *Amici* have worked ceaselessly to evaluate the dangers of and potential public health measures for reducing the deadly spread of COVID-19. COVID-19 poses grave risks to children, even more so to children with special health needs. At the same time, the AAP strongly recommends that all reasonable precautions be taken—including imposing universal masking policies—so that children can safely attend in-person school. As the AAP's comprehensive review has found, the medical literature and the experiences of the front-line pediatric practitioners who make up the TNAAP and AAP's membership prove beyond any doubt that universal mask policies in schools significantly reduce the spread of COVID-19 and protect all children, particularly the medically vulnerable. This brief provides an overview of that literature and explains why universal mask policies are so crucial in fighting COVID-19.

## ARGUMENT

### I. Overview of the AAP's Research Efforts into the Efficacy of Masks

One of the AAP's chief functions is to provide evidence-based guidance to America's pediatric professionals and public health officials, thereby helping its members and policymakers improve the health of all children. To do so, the AAP issues Policy Statements that report the most up-to-date, evidence-based expert consensus on key issues of pediatric practice and public health. These Policy Statements are written by recognized pediatrician experts who undertake a comprehensive review of the medical literature and available data on the topic at hand. They are then peer-reviewed by additional experts across the AAP and approved by the AAP's executive staff and board of directors.

Since the spring of 2020, as the COVID-19 pandemic began to sweep across the country, the AAP's top focus has been supporting practicing pediatricians and public health policymakers

in treating COVID-19 and reducing its spread, particularly among children. The AAP has issued Interim Guidance Statements on several topics related to COVID-19, including guidance on when and how pediatricians should test patients for COVID-19;[2] on providing clinical care to patients with COVID-19;[3] on treating post-COVID conditions;[4] on how to safely provide routine medical care such as check-ups, screenings, laboratory exams, treatment, and immunizations during the COVID-19 pandemic;[5] on caring for youth with special health needs during the COVID-19 pandemic;[6] on supporting the emotional and behavioral health needs of children, adolescents, and families during the COVID-19 pandemic;[7] and—most relevant to this case—on

---

[2] *COVID-19 Testing Guidance*, AAP (last updated July 8, 2021), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-testing-guidance/.

[3] *COVID-19 Interim Guidance*, AAP (last updated Aug. 2, 2021), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/.

[4] *Post-COVID-19 Conditions in Children and Adolescents*, AAP (last updated July 28, 2021), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/post-covid-19-conditions-in-children-and-adolescents/.

[5] *Guidance on Providing Pediatric Well-Care During COVID-19*, AAP (last updated Aug. 30, 2021), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/guidance-on-providing-pediatric-well-care-during-covid-19/.

[6] *Caring for Children and Youth with Special Health Needs During the COVID-19 Pandemic*, AAP (last updated June 28, 2021), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/caring-for-children-and-youth-with-special-health-care-needs-during-the-covid-19-pandemic/.

[7] *Interim Guidance on Supporting the Emotional and Behavioral Health Needs of Children, Adolescents, and Families During the COVID-19 Pandemic*, AAP (last updated July 28, 2021), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/interim-guidance-on-supporting-the-emotional-and-behavioral-health-needs-of-children-adolescents-and-families-during-the-covid-19-pandemic/.

the use of face masks as an infection control measure[8] and on operating safe schools during the

COVID-19 pandemic that foster the overall health of children, adolescents, educators, staff, and

communities.[9] The AAP has repeatedly reviewed and updated these Interim Guidance

Statements to ensure that they reflect the best medical understanding and current scientific

evidence of COVID-19, including its transmission and health effects.

## II.     The Public Health Benefits of Universal Mask Policies in Schools as an Infection Control Measure

Beginning early in the pandemic, members of the AAP began receiving questions from

families and school boards about how in-person education could be conducted safely during the

pandemic. As pediatrician organizations, the AAP and TNAAP recognize and are seriously

concerned about the impact on children of not being able to attend school in person. This can

negatively affect children's cognitive, educational, and social development, as well as children's

short and long-term mood, behavior, and mental health. Children with disabilities suffer even

more disproportionate harm from a lack of in-person school due to loss of access to educational

support structures, school-based therapies, school meals, and school-based professionals who are

often the front-line identifiers of special needs.[10] Additionally, virtual learning is often more

difficult to access for some children with special health care needs.[11] As a result, the AAP

---

[8] *Face Masks*, AAP (last updated Aug. 8, 2021), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/cloth-face-coverings/.

[9] *COVID-19 Guidance for Safe Schools*, AAP (last updated July 18, 2021), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools/.

[10] Houtrow, Amy, et al., *Children with disabilities in the United States and the COVID-19 pandemic*, 13 J. of Pediatric Rehabilitation Medicine, 415, 415-24 (2020), *available at* https://content.iospress.com/articles/journal-of-pediatric-rehabilitation-medicine/prm200769.

[11] *Caring for Children and Youth with Special Health Needs*, *supra* n. 6.

decided to develop Interim Guidance for pediatricians and school boards on considerations regarding safe and healthy schooling and recommendations for measures that can decrease the risk and facilitate in-person learning.

Based on the AAP's expert review of the scientific literature and the guidance outlined by the World Health Organization ("WHO"), United Nations Children's Fund ("UNICEF"), and Centers for Disease Control and Prevention ("CDC"), along with our members' collective expertise as pediatricians and researchers, the AAP concluded, "[e]verything possible must be done to keep students in schools in-person." (Ex. B at 2.) This is because "[s]chools and school-supported programs are fundamental to child and adolescent development and well-being and provide our children and adolescents with academic instruction; social and emotional skills, safety, reliable nutrition, physical/occupational/speech therapy, mental health services, health services, and opportunities for physical activity, among other benefits." (*Id.*) By contrast, "[r]emote learning highlighted inequities in education, was detrimental to the educational attainment of students of all ages, and exacerbated the mental health crisis among children and adolescents." (*Id.*)

The initial AAP Interim Guidance, developed in the spring of 2020, was drafted and reviewed by a number of pediatricians with expertise in a wide variety of disciplines. The drafters reviewed dozens of articles and available data to determine whether and how children could safely attend school during the pandemic.

The result was the AAP Interim Guidances on Face Masks,[12] Safe Schools,[13] and Children with Special Health Needs.[14] These statements were first issued in the spring of 2020 and have been continually reviewed and updated since that time. By this point, the AAP's experts have reviewed hundreds of articles related to the efficacy and safety of masks, as well as their effects (or lack thereof) on the cognitive, social, and psychological development of children. The following discussion is based principally on the current (summer 2021) iterations of these interim guidance documents.

Based on our review of the medical literature, the AAP has determined that "at this point in the pandemic, given what we know now about low rates of in-school transmission *when proper prevention measures are used*, together with the availability of effective vaccines for those age 12 years and up, that the benefits of in-person school outweigh the risks in almost all circumstances." *COVID-19 Guidance for Safe Schools*, *supra* n. 9 (emphasis added). Among the prevention measures we recommend (such as immunization of all eligible individuals and adequate and timely COVID-19 testing), one of the most important is that "**[a]ll students older than 2 years and all school staff should wear face masks at school (unless medical or developmental conditions prohibit use)**." *Id.* (emphasis added).

The AAP's strong recommendation of universal masking for students, teachers, and support staff in school has remained consistent from the beginning—because masks are a safe, effective, and critical infection control measure. This conclusion has been consistently reinforced

---

[12] *Face Masks*, *supra* n. 8.

[13] *COVID-19 Guidance for Safe Schools*, *supra* n. 9.

[14] *Caring for Children and Youth with Special Health Needs*, *supra* n. 6.

by all relevant data and credible research regarding the transmission and health risks of COVID-19 and the effect of wearing masks on children's education, health, and development.

After significant analysis, including analysis of the emerging Delta variant, the AAP reaffirmed its recommendation of universal masking in school settings on July 19, 2021. Eight days later, on July 27, 2021, the CDC followed suit, recommending "universal indoor masking for all teachers, staff, students, and visitors to schools, regardless of vaccination status."[15]

With respect to children with special health needs, the recommendations with respect to masks are the same.[16] Schools should "maintain universal masking" and educate teachers and staff in proper mask use.[17] Universal masking reduces community transmission, thus reducing the likelihood that an infected person will come in contact with a child with special health needs, and reduces the likelihood of transmission to the child if an infected person does come into contact with an especially vulnerable child.[18] These steps should be universal and are separate and apart from any individual education plans that may be necessary for individual children.[19]

There are several reasons for our (and the CDC's) recommendation of universal masking in school. These include:

    a.    a significant portion of the student population is not eligible for vaccination;

---

[15] *Interim Public Health Recommendations for Fully Vaccinated People—Summary of Recent Changes*, CDC (July 28, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html.

[16] *Caring for Children and Youth with Special Health Needs*, *supra* n. 6.

[17] *Id.*

[18] *Id.*

[19] *Id.*

b.      the need to protect unvaccinated students from COVID-19 and to reduce transmission;

c.      the lack of systems to monitor vaccine status among students, teachers and staff;

d.      the potential difficulty in monitoring or enforcing mask policies for those who are not vaccinated; in the absence of schools being able to conduct this monitoring, universal masking is the best and most effective strategy to create consistent messages, expectations, enforcement, and compliance without the added burden of needing to monitor vaccination status;

e.      the possibility of low vaccination uptake within the surrounding school community; and

f.      the continued concerns for variants that are more easily spread among children, adolescents, and adults.

*COVID-19 Guidance for Safe Schools*, *supra* n. 9.

Most importantly, the research literature has confirmed that masks are both effective and safe. As the CDC has explained, masks "reduce the emission of virus-laden droplets . . . , which is especially relevant for asymptomatic or presymptomatic infected wearers who feel well and may be unaware of their infectiousness to others, and who are estimated to account for more than 50% of transmissions." Cloth masks "not only effectively block most large droplets (i.e., 20-30 microns and larger) but they can also block the exhalation of fine droplets." As a result, "[m]ulti-layer cloth masks can both block up to 50-70% of these fine droplets and particles," with "[u]pwards of 80% blockage recorded in some studies. To a slightly lesser extent, masks also "help reduce inhalation of these droplets by the wearer"; multi-layer cloth masks can filter out "nearly 50% of fine particles less than 1 micron."[20]

---

[20] *Science Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2*, CDC (May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html (citations omitted).

8

Numerous studies have shown that increasing the rate of mask-wearing, including through universal mask policies in particular, significantly reduces the spread of COVID-19.[21] In particular, studies have shown that masking and similar mitigation measures can limit transmission in schools.[22] As the ABC Science Collaborative, a 13-state initiative coordinated by

---

[21] *See, e.g.*, Jeremy Howard, et al., *An Evidence Review of Face Masks Against COVID-19*, 118 Proc. of the Nat'l Acad. of Servs. e2014564118 (2021), https://www.pnas.org/content/118/4/e2014564118; T. Brooks & Jay C. Butler, *Effectiveness of Mask Wearing to Control Community Spread of SARS-CoV-2*, 325 J. of Am. Med. Ass'n 998 (2021), https://jamanetwork.com/journals/jama/fullarticle/2776536; Heesoo Joo, et al., *Decline in COVID-19 Hospitalization Growth Rates Associated with Statewide Mask Mandates—10 States, March–October 2020*. 70 Morbidity & Mortality Weekly Rep. 212 (2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7006e2.htm; Derek K. Chu, et al., *Physical Distancing, Face Masks, and Eye Protection to Prevent Person-to-Person Transmission of SARS-CoV-2 and COVID-19: A Systematic Review and Meta-Analysis*, 395 Lancet 1973 (2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)31142-9/fulltext; Christopher T. Leffler, et al., *Association of Country-wide Coronavirus Mortality with Demographics, Testing, Lockdowns, and Public Wearing of Masks*, 103 Am. J. Tropical Med. Hygiene 2400 (2020), https://pubmed.ncbi.nlm.nih.gov/33124541/; Miriam E. Van Dyke, et al., *Trends in County-Level COVID-19 Incidence in Counties With and Without a Mask Mandate—Kansas, June 1-August 23, 2020*. 69 Morbidity & Mortality Weekly Rep. 1777 (2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6947e2.htm; Wei Lyu & George L. Wehby, *Community Use of Face Masks and COVID-19: Evidence from a Natural Experiment of State Mandates in the US*, 39 Health Aff. 1419 (2020), https://www.healthaffairs.org/doi/10.1377/hlthaff.2020.00818.

[22] *See, e.g.*, Patrick Dawson, et al., *Pilot Investigation of SARS-CoV-2 Secondary Transmission in Kindergarten Through Grade 12 Schools Implementing Mitigation Strategies—St. Louis County and City of Springield, Missouri, December 2020*, 70 Morbidity & Mortality Weekly Rep. 449 (2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7012e4.htm?s_cid=mm7012e4_w; Darria L. Gillespie, et al., *The Experience of 2 Independent Schools With In-Person Learning During the COVID-19 Pandemic*, 91 J. Sch. Health 347 (2021), https://onlinelibrary.wiley.com/doi/10.1111/josh.13008; Rebecca B. Hershow, et al., *Low SARS-CoV-2 Transmission in Elementary Schools - Salt Lake County, Utah, December 3, 2020-January 31, 2021*, 70 Morbidity & Mortality Weekly Rep. 442 (2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7012e3.htm; Amy Falk, et al., *COVID-19 Cases and Transmission in 17 K-12 Schools - Wood County, Wisconsin, August 31-November 29, 2020*, 70 Morbidity & Mortality Weekly Rep. 136 (2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7004e3.htm; Fiona Russell et al., *COVID-19 in Victorian Schools: An Analysis of Child-Care and School Outbreak Data and Evidence-Based Recommendations for Opening Schools and Keeping Them Open*, Murdoch Children's Rsch.

the Duke Clinical Research Institute at the Duke University School of Medicine, summed it up, "[p]roper masking is the most effective mitigation strategy to prevent COVID-19 transmission in schools when vaccination is unavailable or there are insufficient levels of vaccination among students and staff."[23]

In short, the science squarely backs up Governor Lee's advice that "If you want to protect your kid from the [COVID-19] virus or from quarantine, the best way to do that is to have your kid in school with a mask."[24]

### III.    Enjoining the Executive Order Is in the Public Interest

Given that requiring masks reduces the spread of COVID-19, it is clear that enjoining the challenged Executive Order would be in the public interest. The challenged Order allows any student to opt out of a school's mask requirements. Students do not need to provide any reason whatsoever for doing so; they merely need a written note from their parent or guardian. *See* Tenn. Exec. Order No. 84 (Aug. 16, 2021).

Allowing exemptions without any justification undermines the efficacy of a universal mask policy. In effect, the Executive Order transforms local mask requirements such as Shelby County's into mere recommendations. While studies have found *universal masking requirements*

---

Inst. & The Univ. of Melb. (Nov. 92020), *available at* https://www.mcri.edu.au/sites/default/files/media/documents/covid-19_in_victorian_schools_report.pdf.

[23] ABC Science Collaborative, *The ABCs of North Carolina's Plan*, https://abcsciencecollaborative.org/the-abcs-of-north-carolinas-plan-a/ (last visited Sept. 1, 2021); *see also* ABC Science Collaborative, *Final Report for NC School Districts and Charters in Plan A*, at 3 (June 30, 2021) , *available at* https://abcsciencecollaborative.org/wp-content/uploads/2021/06/ABCs-Final-Report-June-2021.06-esig-DB-KZ-6-29-21.pdf.

[24] Kimberlee Kruesi, *Health Chief: Children Now 36% of Tennessee's Virus Cases*, AP (Aug. 25, 2021), https://apnews.com/article/health-coronavirus-pandemic-tennessee-32b7ff0dc540a2b11cc8c736c67020fe.

effective at reducing transmission, as discussed above, they have not found the same effect for mask *recommendations*.[25]

Defendant's brief suggests that enjoining the Executive Order would not redress Plaintiffs' injuries because some "individuals with disabilities are unable to wear masks due to their disabilities," and thus there would be no "universal" masking even without the Executive Order. Def.'s Br. at 11 (internal quotation and emphasis omitted). This misunderstands the purpose and function of a universal mask policy. It is entirely appropriate to make exceptions to mask requirements where "medical or developmental conditions prohibit use," as the AAP's Interim Guidance explains. *Face Masks*, *supra* n. 8. Because disabilities that truly prevent masking are rare, exceptions to accommodate an individual child's legitimate medical needs are unlikely to seriously impair a mask policy's power to inhibit transmission, particularly when accompanied by other measures to mitigate the risk.[26] Such isolated, targeted exceptions bear no resemblance to the blanket, justification-free exemptions allowed by the Executive Order.

Defendant further argues that by seeking to invalidate the Executive Order, Plaintiffs are actually seeking an accommodation that can be provided through an Individual Education Plan under the Individuals with Disabilities Education Act. Def's Br. at 4-5. The AAP recommends universal school masking separate and apart from Individual Education Plans.[27] Masking should apply to everyone at the school, not solely to a particular vulnerable child. Universal masking

---

[25] *See* Henning Bundgaard, et al., *Effectiveness of Adding a Mask Recommendation to Other Public Health Measures to Prevent SARS-CoV-2 Infection in Danish Mask Wearers*, Annals of Internal Med. (2020), https://www.acpjournals.org/doi/pdf/10.7326/M20-6817.

[26] With respect to other school-related health requirements, Tennessee law requires certification from a qualified physician for medical exemptions. *See* Tenn. Code. Ann. § 49-6-5001. Schools could use a similar process for assessing appropriate exemptions from masking requirements.

[27] *Id.*

affects the background transmission level to which every child at a school will be exposed.

Schools should *also* continue to work with parents as necessary to update Individual Education

Plans, taking into account transmission levels and school-wide safety precautions—but without

the interference of the Executive Order.

## CONCLUSION

For these reasons and those stated in Plaintiffs' briefs, the public interest would be served

by enjoining the challenged Executive Order.

Dated: September 7, 2021                    Respectfully submitted,

                                            *s/ Samara M. Spence*
                                            Samara M. Spence (TN Bar 031484)
                                            Jeffrey B. Dubner (DC Bar 1013399)*
                                            DEMOCRACY FORWARD FOUNDATION
                                            655 15th St. NW, Ste 800
                                            Washington, D.C. 20005
                                            Tel.: (202) 448-9090
                                            sspence@democracyforward.org
                                            jdubner@democracyforward.org
                                            Counsel for *Amici*

                                            * *Pro hac vice* motion pending

## CERTIFICATE OF SERVICE

I certify that on September 7, 2021, the above brief was filed using the court's Cm/ECF
system, which will notify all registered counsel.

Dated: September 7, 2021                    Respectfully submitted,

                                            *s/ Samara M. Spence*
                                            Counsel for *Amici*