IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | | |
|---|---|---|
| G.S. by and through his parents and next friends, BRITTANY and RYAN SCHWAIGERT, S.T. by and through her mother and next friend, EMILY TREMEL, and on behalf of those similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case 2:21-cv-02552-SHL-atc |
| GOVERNOR BILL LEE, in his official capacity as GOVERNOR OF TENNESSEE, and SHELBY COUNTY, TENNESSEE, | ) ) ) ) ) | |
| Defendants. | ) | |

_____

**RESPONSE OF DEFENDANT GOVERNOR BILL LEE
IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**
_____

Defendant Bill Lee, Governor of the State of Tennessee (the "State Defendant"), by and through the Office of the Tennessee Attorney General, files this response in opposition to Plaintiffs' Motion for Preliminary Injunction. (ECF 2.) Plaintiffs are not entitled to a preliminary injunction because they are not likely to succeed on the merits of their claims. First, Plaintiffs seek relief that is also available under the Individuals with Disabilities Education Act ("IDEA"), 84 Stat. 175, as amended, 20 U.S.C. §§ 1400, *et seq.*, and they failed to exhaust the IDEA's required administrative procedures. Second, Plaintiffs lack standing as they cannot demonstrate a causal connection between their claimed injuries and the State Defendant's conduct. Finally, even if the Court reaches the merits of Plaintiffs' Rehabilitation Act and

Americans with Disabilities Act claims, they nevertheless fail. Therefore, the Court should deny Plaintiffs' request for a preliminary injunction.

## PROCEDURAL SETTING

Plaintiffs, minor children who attend K-12 public schools in Shelby County, Tennessee, filed their Complaint for Declaratory and Injunctive Relief for Violations of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") on Friday, August 27, 2021. (ECF 1 ("Compl.").) The Complaint alleges that State Defendant's Executive Order No. 84 ("Executive Order"), which permits the parents of K-12 students to opt their children out of school face mask requirements, excludes them from public education programs and activities in violation of the Title II of the ADA and Section 504. (Compl. at ¶ 15.) On the same date, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction, requesting the Court enjoin State Defendant from enforcing Executive Order No. 84 in Shelby County. (ECF 2.) On Monday, August 30, 2021, State Defendant filed Responses to Plaintiffs' Motion for Temporary Restraining Order. (ECF 23, 24.) On the same date, the Court heard argument on Plaintiffs' Motion for Temporary Restraining Order and set the hearing on Plaintiffs' Motion for Preliminary Injunction on September 9, 2021. (ECF 26.) On Friday, September 3, 2021, the Court entered an Order Granting Plaintiffs' Motion for Temporary Restraining Order. (ECF 34.)

## ARGUMENT

**I.   Standard of Review**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, ____ U.S. ____, ____, 138 S. Ct. 1942, 1943 (2018) (quotation omitted). "In each case, courts must balance the competing claims of injury and must consider the effect on

each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotation omitted). And in determining whether injunctive relief is proper, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id*.

Four factors determine when a court should grant injunctive relief: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest. *Benisek*, 138 S. Ct. at 1943–44 (2018) (per curiam); 11A Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2948 (3d ed. 1995 & Supp. 2021).

Whether the movant has a strong likelihood of success on the merits is a question of law. *See Ammex, Inc. v. Wenk*, 936 F.3d 355, 359-60 (6th Cir. 2019) (quoting *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam)). In addition to demonstrating a likelihood of success on the substantive claims, a plaintiff must also show a likelihood of success of establishing jurisdiction. *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018). If a plaintiff cannot show a likelihood of jurisdiction, then the court will deny injunctive relief. *See id*.

## II. Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits.

### A. Plaintiffs failed to exhaust administrative remedies under the IDEA.

The IDEA offers federal funds to States in exchange for the commitment to furnish a "free appropriate public education" ("FAPE") to all children with physical or intellectual disabilities. *See* 20 U.S.C. §§ 1400 *et seq*. As defined in the IDEA, a FAPE is instruction tailored to meet the child's "unique needs" and sufficient "supportive services" to enable the child to benefit from that instruction. 20 U.S.C. § 1401(9), (26), (29).

The "individualized education program" ("IEP") is the primary vehicle through which the IDEA ensures that a child receives a FAPE.  *See* 20 U.S.C. § 1414(d).  The IEP is a written statement of, among other things, the child's present level of academic achievement and functional performance, the manner in which the child's disability affects his or her involvement and progress in the general educational curriculum, the child's academic and functional goals, and the program modifications or supports that school personnel can provide the child to advance toward those goals and to participate in extracurricular and nonacademic activities.  *Id.*; (Declaration of Theresa Nicholls ("Nicholls Decl."), ¶¶ 5-8.)

The IDEA establishes a formal process for a parent to dispute an element of, or the implementation of, a child's IEP.  *See* 20 U.S.C. § 1415; (Nicholls Decl., ¶¶ 24-27.)  Dissatisfied parents may file a complaint as to any matter concerning the provision of a FAPE with the child's local educational agency ("LEA").  20 U.S.C. § 1415(b)(6); (Nicholls Decl., ¶ 28.)  The parties may thereafter pursue a mediation process, or the LEA may convene a preliminary meeting with the parents and relevant members of the child's IEP team.  20 U.S.C. § 1415(e), (f)(1)(B); (Nicholls Decl., ¶ 28.)  If the dispute remains unresolved, the matter proceeds to a due process hearing before an impartial hearing officer.  20 U.S.C. § 1415(f)(1)(A).  If the hearing is conducted at the local level, the ruling is appealable to the state agency.  20 U.S.C. § 1415(g).  A parent who remains dissatisfied with the resolution of that administrative process may then seek judicial review by filing a civil action in state or federal court.  20 U.S.C. § 1415(i)(2)(A).

The IDEA's administrative process is beneficial to improve the accuracy and efficiency of judicial proceedings.  *See Perez v. Sturgis Pub. Sch.*, 3 F.4th 236, 244 (6th Cir. 2021) (citing *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 935 (6th Cir. 1989)).  By requiring that dissatisfied parents first seek an administrative remedy, "[f]ederal courts—

generalists with no expertise in the educational needs of handicapped students—are given the benefit of expert factfinding by a state agency devoted to this very purpose." *Id.* (quoting *Crocker*, 873 F.2d at 935). "Were federal courts to set themselves up as the initial arbiters of handicapped children's educational needs before the administrative process is used, they would endanger not only the procedural but also the substantive purposes of the [IDEA]." *Crocker*, 873 F.2d at 935.

Although the IDEA does not limit the rights and remedies available under the ADA or Section 504, it expressly provides "that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA]." 20 U.S.C. § 1415(l). In other words, if a lawsuit seeks relief that is available under the IDEA, a plaintiff cannot bypass the IDEA's administrative process by bringing suit under the ADA or Section 504. *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 754 (2017); *see also Sagan v. Sumner Cty. Sch. Bd.*, 726 F. Supp. 2d 868, 880 (M.D. Tenn. 2010) ("[A]lthough Plaintiffs proceed under the auspices of the ADA, the Rehabilitation Act, and § 1983, the IDEA nonetheless requires them to first exhaust its administrative procedures and remedies prior to commencing a suit[.]").

The IDEA's exhaustion rule hinges on whether a lawsuit seeks relief for the denial of a FAPE. *Fry*, 137 S. Ct. at 754. If a lawsuit charges such a denial, the plaintiff cannot escape the IDEA's administrative process merely by bringing suit under a different statute but must first submit the case to an IDEA hearing officer with experience in addressing the issues raised. *Id.*

To determine whether a suit seeks relief for the denial of a FAPE, courts should look to the substance, or gravamen, of the plaintiff's complaint. *Id.* at 752. That inquiry does not turn

on whether the complaint includes, or omits, the IDEA's distinctive language or whether the plaintiff files suit under a statute other than the IDEA. *Id.* at 755. Rather, the court's inquiry must focus solely on whether the complaint "seeks relief for the denial of an appropriate education." *Id.* In considering whether the claims at issue fit that description, the court should consider "the diverse means and ends of the statutes covering persons with disabilities—the IDEA on the one hand, the ADA and Rehabilitation Act (most notably) on the other." *Id.* The purpose of the IDEA is "to provide each child with meaningful access to education by offering individualized instruction and related services appropriate to her 'unique needs.'" *Id.* The ADA and Section 504, on the other hand, "aim to root out disability-based discrimination" and enable each covered person "to participate equally [with] all others in public facilities and federally funded programs." *Id.*

To determine the gravamen of a complaint, a court should ask two hypothetical questions: (1) whether the plaintiff could have brought essentially the same claim if the conduct occurred at public facility that was not a school (like a public theatre or library); and (2) whether an adult at the school could have pressed essentially the same grievance. *Id.* at 756. If the answer to both questions is "yes," the analysis suggests that the crux of the suit is equality of access to public facilities, rather than meaningful access to education. *Id.* But *Fry* recognized that those hypothetical questions may not be perfectly applicable in every context due to the overlapping coverage of the relevant statutory schemes. *Id.* at 757 n.10 ("Depending on the circumstances, [a plaintiff] might well have been able to proceed under both [the IDEA and the ADA or Rehabilitation Act]."). Rather, they help determine whether a plaintiff who brings a claim under the ADA or Section 504 instead of the IDEA nevertheless raises a claim whose substance is the denial of a FAPE. *Id.* at n.10. The Court thus suggested that a further sign that

the gravamen of a suit is the denial of a FAPE may emerge from the history of the proceedings. *Id.* In particular, a plaintiff's initial choice to pursue a resolution through the IDEA process—thus starting to exhaust the IDEA's administrative procedures before shifting midstream to pursue a judicial resolution—may suggest that the suit seeks relief for the denial of a FAPE. *Id.*

Here, the substance of Plaintiffs' claim is clearly the denial of a FAPE. Plaintiffs expressly allege that the challenged Executive Order impairs their "basic fundamental right of an education for their children." (Compl. ¶ 37.) They similarly assert that withdrawing their children from in-person classes will cause them to "receive less than full and adequate education." (ECF 2-1, PageID 32.) Plaintiffs' concerns are premised on the assertion that, due to the nature of their children's disabilities, their children cannot receive an adequate education through remote or online instruction. (Compl. ¶¶ 36-37.) That is, their children "are unable to learn without the hands-on attention of an in-person teacher." (*Id.* at ¶ 35.)

Those claims are precisely the type that the IDEA's administrative process is intended to address, as another Sixth Circuit district court has held. In *R.Z. by B.Z. v. Cincinnati Public Schools*, the parent of a high school student with a cancer-associated cognitive disability filed suit against the student's school district under the IDEA during a time in which his school operated as 100% remote learning as a result of the COVID-19 pandemic. No. 1:21-cv-140, 2021 WL 3510312, at *1 (S.D. Ohio Aug. 10, 2021). The student, for whom an IEP had previously been developed, alleged that, as a result of his disability, he "face[d] challenges during remote learning" and required in-person instruction in order to receive the education to which he was entitled. *Id.* at *3, 7. The school district filed a motion to dismiss based on the plaintiff's failure to exhaust the IDEA's administrative process. *Id.* at *2. In granting the district's motion, the court concluded that the student's allegations required the type of

7

individualized analysis that forms the bedrock of the IDEA administrative process. *Id.* at \*7-8. Further, the court expressed that "simply adding allegations that other students with disabilities might also have been impacted does not suffice to forego the administrative exhaustion that the IDEA requires." *Id.* at 8.

The same holds true here. Plaintiffs contend that, due to the nature of their children's disabilities, their children cannot receive an adequate education through remote or online instruction. (Compl. ¶¶ 36-37.) That type of individualized need requires the type of individualized remedy the IDEA's administrative process is intended to provide. Despite Plaintiffs' assertions to the contrary, not all students with disabilities require the same modifications to ensure a FAPE. Some students may have disabilities that result in greater susceptibility to COVID-19 but that do not prevent the student from receiving a FAPE through remote instruction during limited periods of increased COVID-19 transmission. Still, those students may lack adequate supervision necessary for remote learning from home. The point, in any event, is that the challenges facing each student are unique to that student. And the remedies available to each are unique. *See B.Z.*, 2021 WL 3510312, at \*6 ("One student's IEP may need to be modified for remote learning during a pandemic, while another student's IEP may remain unchanged.") The IDEA's administrative process is thus designed to afford each student the individualized accommodation that best fits their particular circumstance.

The history of these proceedings demonstrates that the parties are seeking relief from the denial of a FAPE. Indeed, the parents of both named plaintiffs have testified to their concern that their children are faced with the denial of a FAPE (ECF 28, PageID 65-66, 77)—a matter that is IDEA-specific. In addition, both children have an IEP developed and administered pursuant to the IDEA. (*Id.* at 64, 73, 75-76, 79.) The parents of both children know what to do if

8

they disagree with an element of the IEP or believe their child's school has deviated from the IEP. (*Id.* at 64-65, 79). Indeed, G.S.'s mother indicated that she specifically requested "an emergency IEP" to account for the Executive Order in light of her child's special needs, and she was unsatisfied when the superintendent offered her virtual learning. (*Id.* at 73, 77.) That initial pursuit of the IDEA's administrative remedies "provide[s] strong evidence that the substance of [Plaintiffs'] claim concerns the denial of a FAPE[.]" *See Fry*, 137 S. Ct. at 757.

Prior to the 2021-2022 school year, in which may districts planned to return to in-person learning for the first time since the start of the pandemic, the U.S. Department of Education implemented new guidance reaffirming the importance of IDEA's implementation during the COVID-19 pandemic.[1] In addition, the Tennessee Department of Education ("TDOE") has implemented a variety of processes to ensure that students with special needs continue to receive a FAPE during the return to in-person learning. (Nicholls Decl., at ¶¶ 12-23.) And for more than a year, the TDOE has been providing resources and training to assist LEAs in satisfying their obligation under the IDEA to provide students a FAPE as schools return to in-person learning. (*Id.* at ¶¶13-21.) The IDEA's administrative process thus remains the appropriate avenue for resolving issues such as those raised by Plaintiffs in this case. Because Plaintiffs' claims necessitate further exhaustion under the IDEA, they cannot succeed on the merits.

### B.   Plaintiffs lack standing to pursue their claims.

Plaintiffs also lack standing. To establish "the irreducible constitutional minimum of standing," a plaintiff must demonstrate that: (1) they suffered an injury in fact; (2) a causal connection exists between the claimed injury and the conduct complained of that is not the result of the "independent action of some third party not before the court;" and (3) that a favorable

---

[1] U.S. Dep't of Educ., New Guidance Reaffirms Importance of Full Implementation of Individuals with Disabilities Education Act Amidst COVID-19 Pandemic (Aug. 24, 2021).

decision will likely, "as opposed to merely speculative," redress the claimed injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted). Plaintiffs claim that they can demonstrate a "causal connection" because they no longer "felt comfortable sending" their children to school after the Executive Order became effective. (ECF 29, PageID# 235.) Their claim is baseless.

To establish a causal connection, a plaintiff must show that their injury is "fairly . . . trace[able] to the challenged action of the defendant." *See Lujan*, 504 U.S. at 560 (internal quotation marks omitted). Harms that result from "'the independent action of some third party not before the court,'" however, "are generally not traceable to the defendant." *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42 (1976)). In other words, unless the defendant's actions had a "'determinative or coercive effect' upon the third party, the claimant's quarrel is with the third party, not the defendant." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

Here, any violation of Plaintiffs' children's IDEA, ADA, or Section 504 rights is the result of a third-party not before the Court. The State Defendant's Executive Order grants a parent or guardian the right to opt their child out of mask wearing while within a public school. The Order neither commands nor directs a parent or guardian to opt their child out of masking. Nor does the Order contain a provision preventing LEAs from accommodating Plaintiffs' children to provide them with a FAPE or access to the benefits of an education. *See Turanni*, 988 F.3d at 317 (explaining that a third party's discretion "breaks the chain of constitutional causation" without evidence of "command or coerc[ion]"). Schools may provide accommodations by implementing maskless-only classes and activities, staggering schedules to ensure Plaintiffs' children do not interact with maskless children during class changes, or have

monitors prevent interactions between Plaintiffs' children and maskless children, among others. *See A.C. v. Shelby Cty. Bd. of Educ.*, 824 F. Supp. 2d 784, 797 (W.D. Tenn. 2011) (finding that the Shelby County Board of Education did not violate the ADA or Section 504 by "not implement[ing] a school-wide peanut ban . . . because [it] took several precautions to limit [the student's] peanut exposure"), *rev'd on other grounds*, 711 F.3d 687 (6th Cir. 2013). And, as Plaintiffs testified at the Temporary Restraining Order Hearing, their children's schools provided requested accommodations for their children's education. (ECF 28, PageID 205, 213-16.) Because Plaintiffs' asserted injuries are fairly traceable to the independent actions of a third party, and not due to the State Defendant's determinative or coercive conduct, Plaintiffs lack standing. *See Turaani*, 988 F.3d at 316-17 (finding that an injury resulting from a third party's voluntary and independent action does not establish traceability).

### C. Even if the Court reaches the merits of their claims, Plaintiffs' ADA and Section 504 claims nevertheless fail.

Plaintiffs contend that the Executive Order has the effect of denying them equal access to public education, thus violating the ADA and Section 504.[2] (Compl. ¶¶ 15-17.) Plaintiffs advance two theories of liability on their ADA and Section 504 claims against the State. They first assert that the Executive Order prevents local school districts from implementing the protective measures needed for Plaintiffs to attend school safely. (*Id.* at ¶ 58.) Plaintiffs alternatively argue that the State has denied them "a reasonable modification . . . under circumstances where it is required." (*Id.* at ¶ 58(a).) Plaintiffs cannot succeed on either theory.

---

[2] Plaintiffs contend that Defendants are excluding them from participation in public education. (Compl. ¶ 58(b).) But the Complaint makes clear that no conduct by State has physically excluded Plaintiffs or denied them access to school; rather, it is Plaintiffs' subjective risk assessment that is responsible for the alleged "exclusion." (*Id.* at ¶ 17) (complaining that parents must decide between in-person learning, which poses health risks, or remote learning, which may result in learning loss). Plaintiffs proffer no authority establishing that the ADA or Section 504 prohibit this novel form of "exclusion."

11

1. **Plaintiffs admit that their schools can and have acted to protect their health.**

Plaintiffs insist that the Executive Order prevents their local schools from taking measures to ensure their safety at school. But their assertion lacks factual support. Consider, by contrast, the evidence in the record. Theresa Nicholls, Assistant Commissioner for Special Populations at the Tennessee Department of Education, explained that COVID-19 has required schools to think creatively about meeting the needs of students with disabilities. (Nicholls Decl., ¶ 10.) She identified multiple in-person approaches to serving disabled students, none of which require universal masking within the school. (*Id.* at ¶ 13) (citing clustering of medically vulnerable students, deploying rigorous sanitization procedures, and providing small-group instruction as options). At the TRO hearing, Plaintiffs themselves testified to numerous precautions implemented after the Executive Order, all designed to ensure G.S.'s safety. (ECF 28, PageID 73-75, 80.) These precautions include: masking for all adults who interact with G.S.; daily deep cleaning of G.S.'s classroom; placement of a HEPA filter in G.S.'s classroom; modification of school attendance policies to allow G.S. to arrive late and avoid contact with students in the hallways; and modification of lunch and group activities to reduce G.S.'s exposure to unmasked students. (Tr. 73-74, 80.) Where Plaintiffs' testimony contradicts a contention necessary for imposing liability on the State, the Court must conclude that Plaintiffs are unlikely to succeed on the merits.

2. **Plaintiffs are unlikely to succeed on their reasonable modification claim.**

Plaintiffs next disavow any reliance on a disparate-impact theory and argue that the State has denied them reasonable modifications, thus violating the ADA and Section 504. (ECF 29, p. 5.) This argument is unavailing.

12

*McPherson v. Michigan High School Athletic Association, Inc.*, 119 F.3d 453 (6th Cir. 1997) (en banc) is instructive here.  The *McPherson* plaintiff challenged the "eight-semester rule," which limits student eligibility for participation in high school athletics to eight semesters, as violating the ADA and Section 504.  119 F.3d at 455.  The Sixth Circuit described the rule as "neutral"—it was neutral with respect to disability and neutral in its application.  *Id.* at 460.  Since the plaintiff expressly rejected a disparate-impact theory, the court identified two ways the plaintiff could succeed on his claims: either by (1) offering evidence that disabilities were actually considered by the defendant in formulating or implementing the eight-semester rule; or (2) showing that the defendant could have reasonably accommodated his disability but refused to do so.  *Id.*  Plaintiffs here cannot succeed under either prong.

Plaintiffs cannot satisfy prong (1) because they have neither suggested nor presented evidence that Governor Lee's formulation of the Executive Order was motivated by considerations of limiting medically vulnerable students' access to public K-12 education.  Plaintiffs must therefore proceed under prong (2) and show that the State could have reasonably accommodated them and refused to do so.  *See id.*

Plaintiffs here identify only one modification that is acceptable to them—universal masking in Shelby County public schools—and that is the modification they request.  (Compl. ¶¶ 16-17, 70-71.)  The issue is therefore whether universal making in Shelby County schools, which would require suspension of the Executive Order, is a reasonable modification.

To be reasonable, the modification must not impose undue financial or administrative burdens upon the public entity or require a fundamental alteration in the nature of the program.  *McPherson*, 119 F.3d at 461; *Sandison v. Mich. High Sch. Athletic Ass'n*, 64 F.3d 1026, 1034 (6th Cir. 1995); *see* 28 C.F.R. § 35.130(b)(7)(i) (requiring public entities to make reasonable

modifications in policies, practices, or procedures when necessary to avoid disability discrimination, "unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."). Moreover, a reasonable modification is one "that is necessary to avoid discrimination on the basis of disability." *Muhammad v. Ct. of Common Pleas of Allegheny Cty.*, 483 F. App'x 759, 763 (3d Cir. 2012) (citing 28 C.F.R. § 35.130(b)). The reasonableness analysis involves "an individualized inquiry" designed "to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001); *see also Innovative Health Sys., Inc. v. City of White Plains*, 931 F. Supp. 222, 239 (S.D.N.Y. 1996) (stating that a court must balance a plaintiff's interest in seeking an accommodation with a governmental entity's interest in the integrity of its laws).

Plaintiffs are unlikely to demonstrate the reasonableness of their requested modification for two reasons. First, the requested modification is overly broad, unnecessarily implicating many schools and children. Plaintiff G.S. attends West Middle School in the Collierville Municipal School District. (Compl. ¶ 20.) Plaintiff S.T. attends Houston Middle School in the Germantown Municipal School District. (*Id.* at ¶ 21.) But Plaintiffs do not seek to exempt their particular classrooms or schools from the Executive Order. Rather, they request an exemption for all Shelby County K-12 public schools. (*Id.* at ¶¶ 16-17, 70-71.) Such a sweeping modification is almost certainly unreasonable, as it is inconsistent with "the ADA's basic requirement that the need of a disabled person be evaluated on an individual basis." *Martin*, 532 U.S. at 690.

Second, the requested modification does not simply affect the State's policies, practices, or activities. Instead, it affects the practices of third parties, as it requires all children attending Shelby County public schools to wear masks. Where an accommodation imposes obligations on third parties, not simply the employer or public entity, courts have found it unreasonable. *See, e.g.*, *Montenez-Denman v. Slater*, No. 98-4426, 2000 U.S. App. LEXIS 3303, at *6-7 (6th Cir. 2000) (deciding an accommodation was unreasonable where it required everyone in plaintiff's work environment to refrain from wearing scents); *Kaufmann v. GMAC Mortg. Corp.*, 229 F. App'x 164, 168 (3d Cir. 2007) (finding it unreasonable for employer to ensure that no one in plaintiff's work environment wore scented products); *McDonald v. Potter*, No. 1:06-CV-1, 2007 U.S. Dist. LEXIS 57983, at *41 (E.D. Tenn. 2007) (imposing a complete fragrance ban on employees is unreasonable).

## III.  The Public Interest Favors Leaving the Executive Order Undisturbed.

The Executive Order reflects the Governor's balancing of important public interests. Governor Lee issued Executive Order 84 against the backdrop of the COVID-19 pandemic and robust debate among Tennesseans over mask mandates in public schools. Indeed, Governor Lee announced the Executive Order days after a mask mandate in Williamson County schools sparked chaos and uncivility, including threats against medical professionals and mask advocates.[3] In issuing the Executive Order, Governor Lee aimed to balance important interests: the fundamental right of parents to raise their children, including directing their education[4]; the interest of school districts to decide what is best for their schools; and the interest in providing

---

[3] https://www.foxnews.com/us/anti-maskers-tennessee-school-board-mandate

[4] Parents have a constitutionally protected right to direct the education of their children. *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 972 (6th Cir. 2004).

in-person, public education.[5] Exempting Shelby County would upset the balance struck by the Executive Order. Moreover, exempting counties from the Executive Order would intrude on the Governor's authority and discretion to manage COVID-19 and other emergencies. *See* Tenn. Code Ann. § 58-2-107 (vesting the governor with authority to issue executive orders, proclamations, and rules to address emergencies). The public interest lies in preserving Governor Lee's judgment and autonomy concerning emergencies.

## CONCLUSION

Since Plaintiffs' claims under the ADA and Section 504 lack merit, and because they otherwise lack standing and failed to exhaust their remedies under the IDEA the Court should reject their request for a preliminary injunction.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter


s/James R. Newsom III
James R. Newsom (TN BPR No. 6683)
Special Counsel
Matthew R. Dowty (TN BPR No. 32078)
Assistant Attorney General
Robert W. Wilson (TN BPR No. 34492)
Assistant Attorney General
Office of the Tennessee Attorney General
40 South Main Street, Suite 1014
Memphis, TN 38103
(901) 543-2473
Jim.Newsom@ag.tn.gov
Matthew.Dowty@ag.tn.gov
Robert.Wilson@ag.tn.gov

---

[5] https://www.tn.gov/governor/news/2021/8/16/gov--lee-signs-executive-order-giving-parents-ability-to-opt-out-of-school-mask-mandates.html

## **CERTIFICATE OF SERVICE**

I hereby certify that on this the 8th day of September, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing report. Parties may access this filing through the Court's electronic filing system.

s/Robert W. Wilson
Assistant Attorney General
