**STATE OF TENNESSEE**
**OFFICE OF THE ATTORNEY GENERAL**

**July 24, 2020**

**Opinion No. 20-14**

**<u>Constitutionality of Governmental Mandate to Wear Face Coverings</u>**

**<u>Question</u>**

Is a governmental mandate that requires the general population to wear face coverings in public during a state of emergency caused by COVID-19 constitutionally permissible?

**<u>Opinion</u>**

As a general proposition, a governmental mandate that requires the general population to wear face coverings in public due to the health emergency caused by COVID-19 would be constitutionally defensible. The constitutionality of any particular governmental mandate, though, would depend on its specific terms and the underlying authority of the governmental entity issuing it.

**<u>ANALYSIS</u>**

The United States is in a public health crisis due to COVID-19.[1] On January 31, 2020, the United States Department of Health and Human Services determined that, as of January 27, 2020, COVID-19 constituted a nationwide public health emergency.[2] On March 11, 2020, the World Health Organization classified COVID-19 as a global pandemic.[3] The pandemic remains ongoing and is currently surging.[4]

---

[1] COVID-19 is the infectious disease caused by the most recently discovered coronavirus, severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2). *See* World Health Org., *Naming the Coronavirus Disease (COVID-19) and the Virus That Causes It*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (last visited July 16, 2020).

[2] *See* U.S. Department of Health & Human Servs., *Determination that a Public Health Emergency Exists*, https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (last visited July 16, 2020).

[3] *See* World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19-11 March 2020*, https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited July 16, 2020).

[4] *See* Adam Martin, *As U.S. Surge in Coronavirus Cases Continues, Some States Tighten Rules*, Wall Street Journal, July 14, 2020, https://www.wsj.com/articles/coronavirus-latest-updates-071420-11594716924 (last visited July16, 2020).

Symptoms of COVID-19 can include fever, cough, shortness of breath, fatigue, loss of the senses of taste and smell, and body aches, among others.[5] And the health effects of the disease can be severe, including serious damage to the lungs and other internal organs, and death.[6] People with certain underlying health conditions and older adults have a heightened vulnerability to severe illness and death if they contract the virus.[7]

As of July 16, 2020, at least 3,416,428 people in the United States have been infected with the virus and over 135,991 people have died from the disease that it causes.[8] In Tennessee, there have been 68,441 confirmed cases, 3,434 hospitalizations, and 755 deaths[9] since the first case was reported by the Tennessee Department of Health on March 5, 2020.[10]

COVID-19 is particularly dangerous not only because it results in severe illness, but also because it is easily and rapidly transmitted. The disease is believed to be transmitted through respiratory droplets produced by an infected person, close personal contact, or touching a surface with the virus on it.[11] The virus spreads very easily through "community spread."[12] While infected individuals are thought to be the most contagious when they are showing symptoms, asymptomatic individuals are also capable of spreading the virus,[13] which makes response efforts particularly daunting. *See Mays v. Dart*, No. 20 C 2134, 2020 WL 1987007, at *2 (N.D. Ill. Apr. 27, 2020) ("Those who contract the virus may be asymptomatic for days or even for the entire duration of the infection but can still transmit the virus to others, making it more challenging to readily identify infected individuals and respond with necessary precautions.").

---

[5] *See* Centers for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited July 16, 2020).

[6] *See* Meredith Wadman et al., *How Does Coronavirus Kill? Clinicians Trace a Ferocious Rampage Through the Body, from Brain to Toes*, Science, Apr. 17, 2020, https://www.sciencemag.org/news/2020/04/how-does-coronavirus-kill-clinicians-trace-ferocious-rampage-through-body-brain-toes (last visited July 16, 2020).

[7] *See* Centers for Disease Control and Prevention, *People Who Are at Increased Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited July 16, 2020).

[8] *See* Centers for Disease Control and Prevention, *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 16, 2020).

[9] *See* Tenn. Dep't of Health, *Tennessee COVID-19 – July 12, 2020 Epidemiology and Surveillance Data*, https://www.tn.gov/content/tn/health/cedep/ncov/data.html (last visited July 16, 2020).

[10] *See* Tenn. Dep't of Health, *TDH Announces First Case of COVID-19 in Tennessee*, https://www.tn.gov/health/news/2020/3/5/tdh-announces-first-case-of-covid-19-in-tennessee.html (last visited July 16, 2020).

[11] *See* Centers for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited July 16, 2020).

[12] *See* Centers for Disease Control and Prevention, *Frequently Asked Questions: Spread,* https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Basics (last visited July 16, 2020).

[13] *See supra* note 11.

Because there is currently no vaccine, cure, or proven effective treatment for COVID-19,[14] the best way to prevent illness is to avoid being exposed to the virus. The Centers for Disease Control and Prevention ("CDC") recommends frequent hand washing, maintaining good social distance (at least 6 feet), routinely cleaning and disinfecting frequently touched surfaces, and covering mouth and nose with a cloth face covering when around others.[15]

### Tennessee's Response to the COVID-19 Pandemic

On March 12, 2020, Governor Lee declared a state of emergency in response to the COVID-19 pandemic. Since then, he has issued a series of emergency management executive orders designed to slow the spread of the disease and to protect the health of Tennessee residents.[16] The orders have been issued pursuant to the "emergency management" powers granted to the governor by the General Assembly. *See* Tenn. Code Ann. § 58-2-107; Tenn. Att'y Gen. Op. 20-07 (Apr. 27, 2020) (discussing the statutory sources of the Governor's emergency management powers, including his authority during this public health emergency to issue executive orders that have the force of law and his power to delegate authority to local governmental entities and local health departments). In issuing the orders, the Governor has relied on the advice of acknowledged health professionals and has considered data related to the rate and number of infections and hospitalizations in Tennessee.[17]

Pertinent here, on May 22, 2020, Governor Lee issued Executive Order 38 which provides, among other things, that people are strongly urged to wear face coverings in public in accordance with CDC guidelines. Executive Order 38 also authorizes the six counties with locally-run county health departments—i.e., Davidson, Hamilton, Knox, Madison, Shelby, and Sullivan—to issue "additional orders or measures related to the containment or management of the spread of COVID-19, which may permit to a greater degree, or restrict to a greater degree, the opening, closure, or operation of businesses, organizations, or venues in those counties or the gathering of persons," with certain exceptions, such as measures regarding places of worship.[18]

Executive Order 54, issued on July 6, 2020, expanded the scope of Executive Order 38 by specifically delegating authority to county mayors in the 89 counties that do not have locally-run county health departments to issue orders or measures requiring—with specified limitation—or recommending the wearing of face coverings within their jurisdictions. Executive Order 54 also

---

[14] *See* Centers for Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited July 16, 2020); U.S. Food & Drug Admin., *COVID-19 Frequently Asked Questions*, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-frequently-asked-questions (last visited July 16, 2020).

[15] *See supra* note 11.

[16] *See* Governor's Executive Orders Nos. 14-38, 49-54 found at https://sos.tn.gov/products/division-publications/executive-orders-governor-bill-lee (last visited July 16, 2020).

[17] *See id.*; Office of the Governor, https://www.tn.gov/governor/covid-19.html (last visited July 16, 2020).

[18] Executive Order 38 was recently extended until August 29 by Executive Order 50. Both orders found at https://sos.tn.gov/products/division-publications/executive-orders-governor-bill-lee (last visited July 16, 2020).

provides that nothing in Executive Order 38 (or Executive Order 54 itself) preempts or supersedes the authority of bodies in the six counties with locally-run county health departments to issue or enact orders, ordinances, rules, or laws regarding face coverings to mitigate the spread of COVID-19.

This extension of authority to local governmental entities to issue orders or measures that are more restrictive than those provided for by executive order has raised the question whether a governmental mandate to wear face coverings in public is constitutionally permissible.

### Constitutionality of Governmental Mandates to Wear Face Coverings

For more than a century, the United States Supreme Court has recognized that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905). Moreover, during an epidemic, the traditional tiers of judicial scrutiny do not apply. *Id*.; *see The Local Spot, Inc. v. Lee,* No. 3:20-cv-00421, 2020 WL 3972747, at *2 (M.D. Tenn. July 14, 2020); *see also League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, No. 20-1581, 2020 WL 3468281, at *2 (6th Cir. June 24, 2020) ("All agree that the police power retained by the states empowers state officials to address pandemics such as COVID-19 largely without interference from the courts."). In these narrow circumstances, courts are to overturn only those orders that (1) have no "real or substantial relation" to protecting public health or (2) are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Antietam Battlefield KOA v. Hogan*, No. CCB-20-1130, 2020 WL 2556496, at *5 (D. Md. May 20, 2020), appeal docketed, No. 20-1579 (4th Cir. May 22, 2020) (quoting *Jacobson*, 197 U.S. at 31).

A governmental mandate that requires the general population to wear face coverings in public due to the health emergency caused by COVID-19 satisfies this two-prong *Jacobson* test.[19] *First*, a governmental mandate to wear face coverings in public has a "real or substantial relation" to the COVID-19 health crisis. In considering whether a governmental measure has a "real or substantial relation" to a public health crisis, the inquiry is whether the measure is arbitrary or unreasonable. *Jacobson*, 197 U.S. at 28, 38. The governmental decision as to how best to protect the public is afforded great deference. Unless the measure adopted by the government is arbitrary or unreasonable, a court's interference is not justified. *Id*. *See The Local Spot,* 2020 WL 3972747, at *2.

The United States Supreme Court recently emphasized *Jacobson's* teachings regarding the limited role of courts when officials are responding to a public health crisis, especially when those "officials are actively shaping their response to changing facts on the ground." *South Bay*, 140

---

[19]Over the last few months, courts have regularly applied *Jacobson's* principles to uphold measures designed to prevent the spread of COVID-19. *See South Bay United Pentecostal Church v. Newsom*, 140 S.Ct. 1613, 1614 (2020); *League of Indep. Fitness Facilities,* 2020 WL 3468281, at *2; *The Local Spot,* 2020 WL 3972747, at *2; *Antietam Battlefield*, 2020 WL 2556496, at *5 *Calvary Chapel v. Mills*, No. 1:20-cv-00156-NT, 2020 WL 2310913 at *7 (D. Me. May 8, 2020), appeal docketed, No. 20-1507 (1st Cir. May 14, 2020); *Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374, at *6-7 (N.D. Ill. May 3, 2020), appeal docketed, No. 20-1757 (7th Cir. May 6, 2020); *but cf. Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020) (enjoining enforcement of orders to close all organizations that were not "life-sustaining" because the restriction was "inexplicably" applied to some organizations, including plaintiff church, but not others).

S.Ct. at 1614. In denying an application for injunctive relief from a COVID-19 preventive measure, the Court said:

> The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." *Jacobson v. Massachusetts*, 197 U.S. 11, 38, 25 S.Ct. 358, 49 L.Ed. 643 (1905). When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974). Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985).

*Id.* at 1613-14.

Under these precepts, a measure requiring the general population to wear face coverings in public would have a "real or substantial relation" to the COVID-19 health crisis. Health professionals have advised that COVID-19 is "spread mainly through close contact from person to person," primarily "[t]hrough respiratory droplets produced when an infected person coughs, sneezes, or talks."[20] Face coverings reduce the chances that respiratory droplets containing the virus will infect others.[21] Even though some may be unconvinced that wearing face coverings is an effective way to thwart the spread of COVID-19, courts may not second-guess governmental officials when the measures they enact in response to a public health emergency are not arbitrary or unreasonable. *See South Bay*, 140 S.Ct. at 1613-14; *Jacobson*, 197 U.S. at 28.

*Second,* a governmental mandate to wear face coverings in public does not amount to a "plain, palpable invasion of rights secured by the fundamental law." Under the minimal scrutiny required by *Jacobson*, a governmental mandate to wear face coverings in public during the current COVID-19 health crisis does not amount to a "plain, palpable" invasion of clearly protected rights. *Jacobson* itself supports this conclusion. At issue in *Jacobson* was a law that required all adults to get a smallpox vaccination following a smallpox outbreak in Cambridge, Massachusetts. *Jacobson*, 197 U.S. at 12-13. The Court determined that "[w]hatever may be thought about the expediency of this statute, it cannot be affirmed to be, beyond question, in palpable conflict with the Constitution." *Id.* at 31. Requiring a person to wear a face covering during a comparable public health crisis is no more invasive—indeed is arguably less invasive—than requiring a person to be vaccinated.

---

[20] *See supra* note 11.

[21] *See* Centers for Disease Control and Prevention, *About Cloth Face Coverings*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/about-face-coverings.html (last visited July 16, 2020).

Even if traditional constitutional scrutiny applied, the governmental mandate would not impermissibly infringe on a person's constitutional right to liberty or freedom of speech.

Some members of society view a governmental requirement to wear a face covering as a threat to personal liberty, [22] a right guaranteed by the Fourteenth Amendment to the United States Constitution and by the Tennessee Constitution. The Fourteenth Amendment prohibits the deprivation of "liberty . . . without due process of law." Similarly, article I, section 8 of the Tennessee Constitution prohibits the taking of liberty without due process: "That no man shall be taken or imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers, or the law of the land." The "law of the land" phrase is synonymous with the "due process of law" provision in the Fourteenth Amendment to the United States Constitution. *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997).

The liberties secured by the Constitution do "not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint. There are manifold restraints to which every person is necessarily subject for the common good." *Jacobson,* 197 U.S. at 26. Even the right to liberty—the "greatest of all rights"—is subject to constraints. *Id.* at 26-27; *Crowley v. Christensen*, 137 U.S. 86, 89-90 (1890). *See Kansas v. Hendricks*, 521 U.S. 346, 356-57 (1997). It is a "fundamental principle that persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state." *Id*. (internal quotations marks omitted). Thus, as the *Jacobson* Court found, a State has the authority to enact laws to protect the safety of its citizens in the face of an epidemic, including a vaccination mandate.

In sum, "the Constitution does not recognize an absolute and uncontrollable liberty." *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 391 (1937). The liberty safeguard by the Constitution is "liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people." *Id*. Thus, liberty is subject to regulation that is reasonable in relation to its subject and is adopted in the interests of the community. *Id*.

Tennessee courts have regularly embraced the principles espoused in *Jacobson* and *West Coast Hotel* when considering governmental regulations concerning the health, safety, and welfare of the public. *See Mascari v. International Bhd. of Teamsters*, 187 Tenn. 345, 354, 215 S.W.2d 779, 782 (1948) ("In forbidding the deprivation of liberty without due process of law, the Constitution does not recognize an absolute and uncontrollable liberty, but a safeguarded liberty, in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people."); *State v. Greeson*, 174 Tenn. 178, 186, 124 S.W.2d 253, 256 (1939) (liberty rights are subject to give way to power of State to legislate if the object is preservation of public health, safety, morals or general welfare); *Moyers v. City of Memphis*, 135 Tenn. 263, 290, 186 S.W. 105, 112 (1916) ("The possession and enjoyment of

---

[22] *See* Sarah Mervosh et al., *Mask Rules Expand Across U.S. as Clashes over the Mandates Intensify*, The New York Times (July 17, 2020), https://www.nytimes.com/2020/07/16/us/coronavirus-masks.html (last visited July 17, 2020).

'liberty' and 'property' are, of course, subject to such reasonable conditions as may be essential to the safety, health, peace, good order, and morals of the community.").

For instance, challenges to Tennessee's mandatory safety belt law, Tenn. Code Ann. § 55-9-603, have been rejected. Requiring seat belts to be used did not violate the constitutional prohibition against taking liberty without due process. *State v. Crandall*, No. M2012-00299-CCA-R3-CD, 2012 WL 5378003 (Tenn. Crim. App. 2012); *McKinney v. Jarvis*, No. M1999-00565-COA-R9-CV, 2000 WL 279902 (Tenn. Ct. App. 2000).

Similarly, challenges to Tennessee's motorcycle helmet law, Tenn. Code Ann. § 55-9-302, have been rejected. *Arutanoff v. Metropolitan Gov't*, 223 Tenn. 535, 448 S.W.2d 408 (1969); *State v. Vaughn*, 29 S.W.3d 33 (Tenn. Crim. App. 1998). The challengers viewed the motorcycle helmet law as "encroaching on their fundamental right to be left alone vis-à-vis the State." *Vaughn*, 29 S.W.3d at 36-37. They insisted that the decision to wear a safety helmet should be a personal one and they viewed the law as "paternalistic legislation" that constituted an "unwarranted governmental intrusion" into citizens' lives. *Id*. at 37. The courts, however, found the law to be a regulatory safety measure that constituted a valid exercise of the State's police power. *Arutanoff*, 223 Tenn. at 539-43, 448 S.W.2d at 410-12; *Vaughn*, 29 S.W.3d at 37.

It follows that a challenge to a governmental face-cover mandate as violating the constitutional right to liberty is almost certain to be rejected by the courts. The face-cover mandate is likely to be held to be a reasonable regulation to mitigate the transmission of COVID-19 and would not constitute an unconstitutional infringement on liberty interests.

Some people object to wearing a face covering because, since they view the mask as a political and cultural symbol, they believe the government is compelling them to "speak" in a certain way, thereby infringing on their right of free speech.[23] The right to free speech is guaranteed by the First Amendment to the United States Constitution and by article I, section 19 of the Tennessee Constitution.

While a governmental mandate to wear face coverings in public does not regulate speech on its face, it does regulate conduct. The free speech protected by the First Amendment includes not just speech but also "expressive conduct." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). *See Arcara v. Cloud Books, Inc*., 478 U.S. 697, 702 (1986) (First Amendment is implicated when a statute regulates conduct which has the incidental effect of burdening expression). Not all conduct, though, is protected speech under the First Amendment simply because the person engaging in the conduct "intends thereby to express an idea." *Id*. As explained by the United States Supreme Court, "[i]t is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the first protection of the First Amendment." *City of Dallas v. Stranglin*, 490 U.S. 19, 25 (1989).

To qualify as "expressive conduct" there must be an intent to convey a particularized message, which others are likely to understand. *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

---

[23] *See id.*

Wearing a face covering during the COVID-19 pandemic is first and foremost understood as a means of preventing the spread of the virus. Therefore, others would not likely understand that the wearer was displaying a particular political or cultural symbol. *See Antietam Battlefield*, 2020 WL 2556496, at *12 (rejecting First Amendment challenge to face covering requirement during COVID-19 pandemic on these grounds).

Even assuming that refusing to wear a face covering constituted conduct sufficient to implicate constitutional principles of free speech, a governmental mandate to wear a face covering in public during the COVID-19 pandemic would not violate the First Amendment.

The United States Supreme Court has held that

> when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms . . . a government regulation is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien*, 391 U.S. at 376–77.

When the face-cover mandate is analyzed under the four-part *O'Brien* test, it survives a First Amendment challenge. First, the mandate is clearly within the State's power to protect the safety of its citizens against an epidemic. *See Jacobson*, 197 U.S. at 27. Second, the mandate serves the important governmental interest of protecting the safety of the public by mitigating the spread of COVID-19. *Id.* Third, the State's interest in protecting the safety of its citizens is unrelated to the suppression of free speech. The mandate's purpose is not to suppress expression; its purpose is to mitigate the spread of COVID-19. Fourth, the incidental restriction on freedom of expression imposed on those who do not wish to wear a face covering during the COVID-19 pandemic is no greater than necessary to further the State's interest. "[A]n incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *United States v. Albertini*, 472 U.S. 675, 689 (1985). Here, the State's interest in protecting the safety of the public would indeed be less effectively achieved without a mandate that requires the wearing of a face covering in public during the COVID-19 pandemic.[24]

Accordingly, a governmental mandate to wear face coverings in public during the COVID-19 pandemic is constitutionally defensible against a free speech claim.

---

[24] The Tennessee Court of Criminal Appeals in *State v. Vaughn*, *supra*, applied the *O'Brien* test in an identical manner when it considered the challengers' claim that the motorcycle helmet law violated their right to free speech. *Vaughn*, 29 S.W.3d at 38–39. In similar fashion, the court determined that all four elements were easily satisfied. *Id.*

In sum, as a general proposition a governmental mandate that requires the general population to wear face coverings in public due to the health emergency caused by COVID-19 would be constitutionally defensible. The constitutionality of any particular governmental mandate, though, would depend on its specific terms and the underlying authority of the governmental entity issuing it.

HERBERT H. SLATERY III
Attorney General and Reporter


ANDRÉE SOPHIA BLUMSTEIN
Solicitor General


LAURA T. KIDWELL
Assistant Solicitor General


Requested by:

The Honorable Charme Allen
District Attorney General
Office of the District Attorney General, 6th Judicial District
P.O. Box 1468
Knoxville, TN 37901