# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| G.S., by and through his parents and next friends, BRITTANY AND RYAN SCHWAIGERT; S.T., by and through her mother and next friend, EMILY TREMEL; J.M., by and through her mother and next friend, KIMBERLY MORRISE; and on behalf of those similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | No. 21-cv-02552-SHL-atc |
| v. | ) ) | |
| GOVERNOR BILL LEE, in his official capacity as GOVERNOR OF TENNESSEE and SHELBY COUNTY, TENNESSEE, | ) ) ) ) | |
| Defendants. | ) | |

---

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

Before the Court are Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Motion for Preliminary Injunction"), (ECF No. 2), Defendant Governor Bill Lee's ("Governor Lee" or "Defendant"[1]) Response to Plaintiffs' Motion for Preliminary Injunction, (ECF No. 49), Plaintiffs' Reply to Governor Lee's Response, (ECF No. 56), and Defendant Shelby County's ("the County") Response to Plaintiffs' Motion for Preliminary Injunction, (ECF No. 57).

In their Motion, Plaintiffs seek to enjoin the enforcement of Governor Lee's Executive Order No. 84 ("Executive Order"), which provides parents or guardians of children in Tennessee the right to opt their children out of wearing masks in schools, even if a school, school system,

---

[1] The County does not oppose the relief sought by Plaintiffs in their Motion for Preliminary Injunction. Therefore, "Defendant" refers to Governor Lee.

local health department, or other governmental entity requires that masks be worn in schools to mitigate the spread of COVID-19.  (ECF No. 2.)  Plaintiffs allege that, before the Executive Order, Shelby County Health Department's universal indoor masking requirement allowed their children, all of whom have disabilities that render them more vulnerable to severe consequences from COVID-19, to attend school without a heightened risk of contracting the disease.  By permitting parents to opt their children out of this mandate, Plaintiffs allege that the Executive Order denies their children rights under the American with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") to access reasonable protection from the threat of exposure to COVID-19.  Plaintiffs argue that only restoration of Shelby County Health Department's mask requirement without the restraint of Governor Lee's Executive Order will provide relief from these violations.

The Court previously entered a Temporary Restraining Order based on the record at the time of the hearing on Plaintiffs' Motion for Temporary Restraining Order ("TRO Hearing"), and now Defendant has had the opportunity to offer proof.  Based on the evidence presented, the Court **GRANTS** the Motion for Preliminary Injunction.  First, the Court finds that Plaintiffs are likely to be successful on the merits of their claim.  Plaintiffs offered sufficient evidence at this stage to demonstrate that the Executive Order interferes with Plaintiffs' ability to safely access their schools.  Further, contrary to Governor Lee's position that Plaintiffs have not properly exhausted their administrative remedies under the Individuals with Disabilities Education Act ("IDEA") and have no standing to bring these claims due to a lack of causation, Plaintiffs face no IDEA exhaustion requirement and do have standing.  Finally, Plaintiffs will face irreparable injury if the Executive Order remains in place, and the public interest is served by enjoining the enforcement of this Executive Order.

2

## PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint for Declaratory and Injunctive Relief for Violations of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, (ECF No.1), and their Motion for Temporary Restraining Order and Preliminary Injunction, (ECF No. 2), on Friday, August 27, 2021.  Plaintiffs filed a Motion to Certify Class by All Plaintiffs on August 28, 2021. (ECF No. 16.)  On August 30, both the County and Governor Lee filed Responses to Plaintiffs' Motion for a Temporary Restraining Order.  (ECF Nos. 23 & 24.)  The Court held its TRO Hearing on August 30, 2021, and Plaintiffs filed a Reply to Governor Lee's Response later that same day.  (ECF No. 29.)  On August 31, 2021, the County filed a Supplemental Response to Governor Lee's Response, and Governor Lee filed a Sur-Reply in opposition to Plaintiffs' Motion.  (ECF Nos. 30 & 31.)  The Court granted leave for the Council of Parent Attorneys and Advocates to file an Amicus Brief based on their interest in the case, and the Council did so on September 1, 2021.  (ECF No. 32.)  On September 3, 2021, the Court entered an Order Granting Plaintiffs' Motion for Temporary Restraining Order, set to expire at 4 p.m. on Friday, September 17, 2021.  (ECF No. 34.)

On September 8, 2021, Governor Lee filed a Response to Plaintiffs' Motion for Preliminary Injunction, (ECF No. 49), and, on the morning of September 9, 2021, Plaintiffs filed a Motion to Strike Defendant's Response.  (ECF No. 50.)  The Court also granted leave for the Tennessee Chapter of the American Academy of Pediatrics and American Academy of Pediatrics to jointly file as amici curiae in support of Plaintiffs' Motion for Preliminary Injunction, which the organizations did on September 7, 2021.  (ECF No. 41.)  The Court heard Plaintiffs' Motion for Preliminary Injunction ("Preliminary Injunction Hearing") on September 9, 2021, during which Defendant offered one witness, Theresa Nicholls, the Assistant Commissioner of Special

Populations (hereinafter "Assistant Commissioner Nicholls") at the Tennessee Department of Education ("TDOE"), and the Court denied Plaintiffs' Motion to Strike Defendant's Response. (ECF No. 52.)  Later on September 9, 2021, Plaintiffs filed an Amended Complaint that added Plaintiff and proposed class member J.M. to the lawsuit.  (ECF No. 54.)  On September 10, 2021, Plaintiffs filed their Reply to Governor Lee's Response, (ECF No. 56), and the County filed their Response to Plaintiffs' Motion for Preliminary Injunction.  (ECF No. 57.)

## FACTUAL BACKGROUND[2]

COVID-19 continues to ravage the health of children and adults alike across the State of Tennessee.  As of September 8, 2021, Shelby County alone had 1295 new cases of COVID-19, and 438 people who were infected – or 34% of the County's total infections – were pediatric cases.  (ECF No. 53 at PageID 1149.)  Moreover, children below the age of 12 years are still generally ineligible for the vaccine, the one approach currently available that has been shown to reduce the likelihood of a negative outcome from contracting the virus.  (ECF No. 54 at PageID 1178.)

"[C]hildren with medical complexity, with genetic, neurologic, metabolic conditions, or with congenital heart disease can be at increased risk for severe illness from COVID-19."  (ECF No. 54 at PageID 1179.)  Children who have obesity, diabetes, asthma, chronic lung disease, sickle cell disease, and immunosuppression are also at greater risk of severe illness.  (ECF No. 54 at PageID 1179.)  "[If] [c]hildren with chronic diseases and other disabilities . . . acquire

---

[2] The Court relies on the testimony offered at the TRO Hearing held on August 30, 2021, the Preliminary Injunction Hearing held on September 9, 2021, and the filings related to both Hearings in reaching its factual findings. After consultation with Counsel for Defendant Governor Lee and without objection, Plaintiffs relied on the testimony and evidence from the TRO Hearing, and all declarations and evidence they submitted up until that point, for the Hearing for the Preliminary Injunction. For purposes of judicial economy, the Court will incorporate facts and evidence from both hearings for purposes of this Order.

COVID-19, they could very well develop severe disease and they could die."  (ECF No. 28 at PageID 1037.)

### I.    Plaintiffs

The three Plaintiffs in this case fall into this vulnerable category.  Plaintiff S.T. is an eleven-year-old who suffers from chromosomal abnormality, and, among other medical consequences, this condition places her at risk of suffering episodic ataxia when her body temperature significantly increases.  (ECF No. 54 at PageID 1176-77.)  Because COVID-19 can cause fevers, which "render her incapacitated," and due to other potentially neurological implications of the disease, her parents and she have exercised "extreme caution" from COVID-19 exposure.  (ECF No. 28 at PageID 1050.)  Plaintiff G.S. is a thirteen-year-old who is autistic and is immuno-compromised as a result of chemotherapy treatment.  (ECF No. 54 at PageID 1182.)  G.S. faces a threat of possible renal failure and other serious or fatal harm if he were to contract COVID-19.  (ECF No. 28 at PageID 1071.)  Plaintiff J.M. is a fourteen-year-old with a primary immunodeficiency, meaning that she "suffers significantly more severe symptoms when she acquires an infection," including additional medical treatment even for the common cold – much less for a more serious illness such as COVID-19.  (ECF No. 42-1 at PageID 315.)  All three Plaintiffs are enrolled in public schools within Shelby County.  (See ECF No. 54 at PageID 1176-77.)

### II.    COVID-19 in Shelby County: Before Executive Order No. 84

Based on the uptick in cases caused by the contagious Delta variant of COVID-19, public health organizations and hospitals in Memphis and elsewhere – including the Centers for Disease Control and Prevention ("CDC"), American Academy of Pediatrics, and Le Bonheur Children's Hospital – provided guidance recommending "universal indoor masking" within schools during

the 2021-22 school year to protect children from exposure to COVID-19 and to limit the spread

of the virus by the mask-wearer.  (Id. at PageID 1173.)  Masking has been found to be a critical

prevention tool in schools, as these closed environments spread the airborne disease more easily,

and the population of students under age twelve is generally unvaccinated.  (See ECF No. 28 at

PageID 1036 (Plaintiffs' witness Dr. Sara Cross testifying that by putting children in classrooms,

"we are putting children in a situation . . . which poses the greatest risk of them acquiring

COVID-19, especially if they are not wearing masks.").)  Governor Lee has agreed that masks

are effective in preventing COVID-19 transmission for children in schools.[3]

In line with these recommendations and facing its own surge in cases, including the

"most troubling of all" information that "children are now experiencing higher rates of severe

outcomes if they contract the Delta variant of the virus," on August 6, 2021, Shelby County

Health Department issued an amended Health Directive to require universal indoor masking.

(See Amended Health Order No. 24 (requiring "universal indoor masking for all teachers, staff,

students, and visitors to the schools, regardless of vaccination status."); see also ECF No. 54 at

PageID 1173.)

III.      COVID-19 in Shelby County: After Executive Order No. 84

For ten days, schools in Shelby County complied with the County's health orders.  (ECF

No. 54 at PageID 1174; see also ECF No. 57 n.1.)  But, on August 16, 2021, Governor Bill Lee

issued Executive Order No. 84, providing parents or guardians the option to opt their children

out of any mask mandate applicable to schools in Tennessee, and here applicable to Shelby

---

[3] When discussing Executive Order No. 84, Governor Lee stated that "If you want to protect
your kid from the virus or from quarantine, the best way to do that is to have your kid in school
with a mask."  (See ECF No. 54, n.1 (citing Kimberlee Kruesi, Health Chief: Children now 36%
of Tennessee's Virus Cases, Associated Press (Aug. 25, 2021), https://apnews.com/article/health-
coronavirus-pandemic-tennessee-32b7ff0dc540a2b11cc8c736c67020fe.).)

County's Amended Health Order No. 24.  See Exec. Order No. 84, State of Tennessee (August 16, 2021) ("a student's parent or guardian shall have the right to opt out of any order or requirement for a student in kindergarten through twelfth-grade to wear a face covering at school, on a school bus, or at school functions, by affirmatively notifying in writing the local education agency or personnel at the student's school.").  Before issuing this Order that impacted every school-aged child in the state, the Governor did not consult the "most senior official [in] the State of Tennessee with responsibility for ensuring the rights of disabled students," Assistant Commissioner Nicholls, who testified at the Preliminary Injunction Hearing.  (ECF No. 53 at PageID 1139.)

As a result of Executive Order No. 84, local education agencies ("LEAs") falling under the jurisdiction of Shelby County Health Department's directive could no longer require all students to be masked.  (ECF No. 54 at PageID 1174.)  Given this change, the Shelby County Health Department issued Health Order No. 25, officially listing Executive Order No. 84 as an exception to the county-wide mandate on wearing masks in schools.  (Id.)

Since the Executive Order was instituted, "parents of more than 1,392 students in Collierville Schools and more than 1000 students in Germantown Municipal Schools," all located in Shelby County and encompassing Plaintiffs' schools, "have opted out of the Shelby County mask requirement."  (Id. at PageID 1181.)  The TDOE has "had to respond to questions and technical assistance requests" from LEAs in the wake of the Executive Order, but has not yet published guidance for in-school settings where unmasked children are present.  (ECF No. 53 at PageID 1135-36.)

All three Plaintiffs are enrolled in schools subject to the Executive Order.  One week after its issuance, a child in S.T.'s class who was unmasked contracted COVID-19, and it spread to

S.T.  (ECF No. 28 at PageID 1051-52.)  At the time of the TRO hearing, the opt-out rate at S.T.'s

school, Houston Middle School, was 22%, with already 27 student cases "in just over two weeks

of class."  (ECF No. 54 at PageID 117; ECF No. 2-5 at PageID 58.)  As for G.S., at the time of

the TRO Hearing, the presence of unmasked children at his school was at "about 17 percent."

(Id. at PageID 1067.)  G.S., who is not always physically capable of wearing a mask due to his

disability, "must rely on his community to take steps to protect him from infection from COVID-

19."  (ECF No. 54 at PageID 1182.)  Because he must avoid unmasked children who could

expose him to COVID-19, G.S. now cannot attend PE class with neurotypical peers, go to the

lunchroom, or do "anything that is going to expose him to the general population" – including

even walking in the hallways at the same time as his unmasked peers.  (ECF No. 28 at PageID

1067.)  Similarly, J.M. now eats lunch in the library to be separate from other children and must

take "circuitous routes to class" to avoid hallway crowding.  (ECF No. 42-1 at PageID 316.)  Her

mother stated that J.M. might still "choose not to participate in large gatherings even with an

enforceable mask mandate," but right now she has no choice: she cannot attend any of them

without incurring a serious risk to her health.  (Id.)

## ANALYSIS

Based on the testimony and evidence offered at the TRO Hearing and at the Preliminary

Injunction Hearing and related filings, and pursuant to Federal Rule of Civil Procedure 65, the

Court finds that good cause exists to issue a Preliminary Injunction against Governor Lee and the

County, enjoining the enforcement of Executive Order No. 84.  A district court must balance

four factors when determining whether a plaintiff is entitled to preliminary injunctive relief:

(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the

movant has shown that he or she would suffer irreparable harm if the preliminary relief is not

issued; (3) whether the issuance of a preliminary injunction will cause substantial harm to third parties; and (4) whether the public interest would be served by the issuance of a preliminary injunction.  Sandison v. Michigan High School Athletic Ass'n, 64 F.3d 1026, 1030 (6th Cir. 1995).  Here, Plaintiffs have carried their burden of proof as to all four factors.  Each factor is addressed below, along with Governor Lee's arguments in opposition.

### I.   Likelihood of Success on Merits

#### A.   Plaintiffs' Failure to Accommodate Claim

The first factor under consideration in the injunction analysis asks whether, in light of all evidence and testimony offered at this stage, Plaintiffs' claims under the ADA and Rehabilitation Act are likely to succeed.  The Court concludes that they are.

The ADA and the Rehabilitation Act "in this circuit share the same substantive standard." Zibbell v. Mich Dept of Human Servs, 313 Fed.Appx. 843, 849 (6th Cir. 2009) (quoting Jones v. Potter, 488 F.3d 397, 403 (6th Cir. 2007)).  Thus, the court reviews claims under the Rehabilitation Act as though they were brought under the ADA.  Id. (quoting Doe v. Salvation Army in the United States, 531 F.3d 355, 357 (6th Cir. 2008)).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132; see also Wilson v. Gregory, 3 F.4th 844, 859 (6th Cir. 2021). Claims for reasonable accommodations are cognizable under Title II of the ADA.  Roell v. Hamilton Cty., 870 F.3d 471, 488 (6th Cir. 2017).

To recover on a failure-to-accommodate claim, a plaintiff must establish that: "(1) he is disabled; (2) he was 'qualified' to take part in the 'services, programs, or activities' of the public

9

entity; (3) he was 'excluded from participation in' or 'denied the benefits of' such 'services, programs, or activities'; and (4) this exclusion or denial occurred 'by reason of' his disability." Keller v. Chippewa Cty., Michigan Bd. of Commissioners, No. 20-2086, 2021 WL 2411873, at *4 (6th Cir. June 14, 2021) (quoting 42 U.S.C. § 12132).  A refusal to provide a reasonable accommodation can serve as direct evidence of disability discrimination.  See Roell, 870 F.3d at 488; Ability Ctr. of Greater Toledo v. City of Sandusky, 385 F.3d 901, 907-08 (6th Cir. 2004).

        The first two elements of Plaintiffs' failure-to-accommodate claim are not in dispute at this stage.  Plaintiffs suffer from serious medical conditions that "substantially limit[] one or more major life activity," and have demonstrated that they are qualified to take part in their respective school's "services, programs, or activities."  42 U.S.C. § 12102; see also Moorer v. Baptist Memorial Health Care Sys., 398 F.3d 469, 479 (6th Cir.2005) (quoting 29 C.F.R. § 1630.2(i) ("a major life activity means 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'")).

        Governor Lee contends that Plaintiffs lack support to establish the last two factors of their failure to accommodate claim, focusing on whether, with a masking opt-out, Plaintiffs have been excluded from participating or denied benefits of such services, programs, or activities.  First, Governor Lee argues that his Executive Order has not prevented schools from protecting the health of disabled students through precautions other than masks.  (ECF No. 49 at PageID 470.) Second, he contends that a universal mask mandate is not a reasonable modification.  In support of the second argument, the Governor relies on McPherson v. Michigan High School Athletic Association, Inc., 119 F.3d 453 (6th Cir. 1997) (en banc), to argue that Plaintiffs are proceeding under a "neutral" law – in other words,  under a law that was created without respect to disability and applies no differently to those with or without disabilities.  In such a case, Governor Lee

contends that, without evidence that he considered disabilities when formulating the law, to succeed, Plaintiffs must show that he could have reasonably accommodated their disabilities but refused to do so.  (ECF No. 49 at PageID 471.)  Plaintiffs cannot satisfy this burden with universal masking, Governor Lee contends, because their requested modification is "overly broad, unnecessarily implicating many schools and children," and unreasonably affects the practices of third parties by requiring all children in Shelby County public schools to wear masks.  (Id. at PageID 472-73.)[4]

As to the second argument, Plaintiffs disagree – first relying on an opinion of Tennessee's Attorney General that concludes that universal masking is in fact a "reasonable regulation," even upon application to the much broader category of the general population.  (ECF No. 56-1; see Office of the State Attorney General, Opinion No. 20-14 ("The face-cover mandate is likely to be held to be a reasonable regulation to mitigate the transmission of COVID-19 and would not constitute an unconstitutional infringement on liberty interests.").)  In response to Governor Lee's argument regarding the burden on third parties, Plaintiffs point to mandatory requirements for school children in other areas: schools require certain vaccines and many schools require uniforms.  (ECF No. 53 at PageID 1152.)  While these are not accommodations that schools have made under the ADA or Rehabilitation Act, they are requirements that schools have implemented that require children to act affirmatively.  Again relying on the Tennessee Attorney General's opinion related to masking requirements, Plaintiffs argue that there are

---

[4] While Defendant did not articulate this as a constitutional argument, if Defendant did intend to argue that the liberty interests of children were being violated, then Plaintiffs' citation to the Attorney General's Opinion No. 20-14 is relevant: "The face-cover mandate . . . would not constitute an unconstitutional infringement on liberty interests."  Opinion No. 20-14 of the Office of the State Attorney General.  However, as this legal issue is not explicitly before the Court, it will not be addressed in full.

"manifold restraints to which every person is necessarily subject for the common good,"

including wearing masks.  Office of the State Attorney General, Opinion No. 20-14 (quoting

Jacobson v. Massachusetts, 197 U.S. 11, 26 (1905)).

Like Plaintiffs, the Court also disagrees with Governor Lee on this point, and concludes

that universal masking is a reasonable accommodation that the Governor's Executive Order

refuses to make available to schools, school systems and, in this case, the Shelby County Health

Department.  Plaintiffs therefore satisfy their failure to accommodate claim at this stage.

At the heart of this evaluation is whether there is a reasonable accommodation available

to protect disabled students and thus allow them access to their schools.  Title II's implementing

regulations set forth the reasonable accommodation requirement.  See 28 C.F.R. §

35.130(b)(7)(i) ("A public entity shall make reasonable modifications in policies, practices, or

procedures when the modifications are necessary to avoid discrimination on the basis of

disability, unless the public entity can demonstrate that making the modifications would

fundamentally alter the nature of the service, program, or activity.").  A plaintiff bears the initial

burden of proposing an accommodation and demonstrating that it is objectively

reasonable.  Coulson v. The Goodyear Tire & Rubber Co., 31 F. App'x 851, 857 (6th Cir. Mar.

14, 2002).  Unless a modification "fundamentally alter[s] the nature" of a public school

education or activity within the school, the modification could be found to be reasonable.  The

question then here is whether universal masking in schools is necessary and reasonable to

accommodate the needs of children with disabilities who face heightened risk of serious illness

due to COVID-19 exposure.

A universal indoor masking requirement is objectively reasonable under the

circumstances, and the Shelby County Health Department has found the requirement to be

necessary, as evidenced by its mandate.  First, the use of masks is overwhelmingly supported as

a means of preventing COVID-19 transmission, as the proof offered here from medical experts

shows.  (See ECF Nos. 2-4, 2-5, 41.)  Masking has even been confirmed by Governor Lee as an

effective method of preventing COVID-19 transmission for children in schools, (ECF No. 54 at

PageID 1170, n.1.), and Assistant Commissioner Nicholls stated that "I don't see why [local

education agencies] couldn't consider [the use of a masking policy]" in order to accommodate

children with disabilities.  (ECF No. 53 at PageID 1142.)  Schools in Shelby County have

already implemented mask requirements without fundamentally altering how the schools have

operated.  (See ECF No. 53 at PageID 1150) (Plaintiffs' counsel stating that "in Shelby County,

all students did it for the first week of school until Governor Lee issued his executive order. . .

They did it last year.").)  Indeed, classroom set-ups, hallways, cafeterias, school buses, libraries,

PE classes, and more do not have to be altered to implement this accommodation.

     Alternatively, if one considers Defendant's proposed remedy – that individuals with

disabilities receive individualized procedures or supports to protect them from exposure – these

procedures could require additional facilities, such as a larger gymnasium or outdoor seating

areas, additional instructors to monitor smaller groups of segregated unmasked and masked

children, more complex policies and schedules regarding class breaks and moving between

courses, or a bus system that separately transported unmasked and masked children.  The need

for these alterations could change on a daily basis, if parents were to change their minds as to

whether to keep their children masked.  The accumulation of costs, alternative schedules, and

other changes stands in stark contrast to the cost-effective, minimally burdensome requirement

for children to wear masks when at school.  As stated by Plaintiffs and agreed to by Assistant

Commissioner Nicholls, it would likely be easier for someone planning school policies and

educational strategies if everybody "just wore a mask."  (ECF No. 53 at PageID 1147.)  Assistant

Commissioner Nicholls' office's delay in developing guidance for managing both unmasked and

masked children in school buildings and activities buttresses the reasonableness of this singular

policy, as opposed to attempting to put a complex and individualized system of procedures in

place.

Additionally, a masking requirement does not pose an unreasonable burden on other

children at Shelby County public schools.  First, Governor Lee's support for his position relies

on inapplicable case law involving employer bans on perfume scents, and cites no authority

related to health precautions in a school environment, much less within a deadly pandemic.  See

Montenez-Denman v. Slater, 208 F.3d 214 (6th Cir. 2000); McDonald v. Potter, No. 1:06-CV-1,

2007 WL 2300332, at \*42 (E.D. Tenn. Aug. 7, 2007), aff'd, 285 F. App'x 260 (6th Cir. 2008).

Moreover, Plaintiffs are right: wearing masks is an action that other children may take for the

"common good" of their classmates, see Opinion No. 20-14 of the Office of the State Attorney

General, in line with the broader common good of "stemming the proliferation of COVID-19."

Perez-Perez v. Adducci, 459 F. Supp. 3d 918, 931 (E.D. Mich. 2020).

Finally, any impact on third parties from masks must be compared to the impact that

would result from other potential accommodations.  At the Preliminary Injunction Hearing,

Assistant Commissioner Nicholls stated that she thought that Executive Order No. 84 "would

limit one method of ensuring access [to school for children with disabilities]; other methods

would have to be considered."  (ECF No. 53 at PageID 1143.)   However, considering those

alternatives, she also conceded it would not be "an easy logistical . . . scheduling to make [the

educational environment as inclusive as possible] work." (Id. at PageID 1145.)[5]   Within that

context, masking is the most reasonable approach.  Therefore, the Court concludes that Plaintiffs

have not only shown that the accommodation of required indoor masking is reasonable, but also

that the Governor's Executive Order rejected this accommodation in favor of more costly,

inefficient alternatives.

This conclusion also answers Governor Lee's other argument regarding Plaintiffs'

success on the merits.  As previously stated, the Governor argues that the record shows that

schools have already employed safety measures to protect students from COVID-19 exposure.

(See ECF No. 49 at PageID 470 ("Nicholls. . . identified multiple in-person approaches to

serving disabled students. . . [and] [a]t the TRO hearing, Plaintiffs themselves testified to

numerous precautions implemented after the Executive Order . . . includ[ing]: masking for all

adults who interact with G.S.; daily deep cleaning of G.S.'s classroom; placement of a HEPA

filter in G.S.'s classroom; modification of school attendance policies to allow G.S. to arrive late

and avoid contact with students in the hallways; and modification of lunch and group activities to

reduce G.S.'s exposure to unmasked students.").)  Governor Lee contends that because it is

"necessary for imposing liability on the State" for the Executive Order to prevent schools from

implementing these measures, if schools have in fact acted, Plaintiffs' claims fail.  (Id.)

---

[5] In an Eastern District of Tennessee employment discrimination case referenced by Plaintiffs, the Magistrate Judge stated that "[t]he term 'reasonable,' as it is employed in the ADA, would have no meaning if employers were required to provide employees the maximum accommodation or every conceivable accommodation possible." McDonald v. Potter, No. 1:06-CV-1, 2007 WL 2300332, at *1 (E.D. Tenn. Aug. 7, 2007), aff'd, 285 F. App'x 260 (6th Cir. 2008).  In a similar sense, here, "reasonableness" may lose meaning if one reasonable accommodation, already in place, were superseded by a much more complex, costly, and less efficient accommodation.

The Court disagrees with Defendant's characterization of Plaintiffs' testimony at the TRO Hearing, or that schools have acted to ensure disabled students' safety after the Executive Order. G.S.'s mother testified at the TRO Hearing that the measures her son's school attempted to put in place to protect his health after the Executive Order are ineffective. If the Executive Order remains in effect, she is "putting [her] child into a high risk situation every day for his health. He could die." (ECF No. 28 at PageID 1071.) And the proof from the medical professionals supported her position, stating that masking by all students is important for all students, but particularly for those – such as disabled students – who are at a greater risk of a negative outcome from COVID-19. (See ECF Nos. 2-4 (Decl. of Dr. Wilson-Townsend), 2-5 (Decl. of Dr. Cross), 28 (hearing testimony from Dr. Wilson-Townsend and Dr. Cross), 41-1 (Amici Brief by Tennessee Chapter of the American Academy of Pediatrics, American Academy of Pediatrics).) Schools cannot implement adequate health measures to ensure Plaintiffs' access to school with the Executive Order in place.

    B.  Standing

In addition to contesting Plaintiffs' likelihood of success on the merits, Defendant also renewed his standing argument in his Response. The Supreme Court has identified three elements that make up the "irreducible constitutional minimum of standing." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)). Defendant argues that the second element of this inquiry – traceability – is not satisfied.

16

Traceability "is not focused on whether the defendant 'caused' the plaintiff's injury in the liability sense," Wuliger v. Mfrs. Life Ins. Co., 567 F.3d 787, 796 (6th Cir. 2009), because "causation to support standing is not synonymous with causation sufficient to support a claim." Parsons v. United States Dep't of Justice, 801 F.3d 701, 715 (6th Cir. 2015). The causation alleged by plaintiff need not be proximate; instead, plaintiff's injury need only be "fairly traceable to the defendant's conduct." Lexmark Intern., Inc. v. Static Control Components, Inc., 572 U.S. 118, 134 n.6 (2014); see also Parsons, 801 F.3d at 713.

The fact that a plaintiff's injury is indirect does not "destroy standing as a matter of course," unless the injury is the result of "the independent action of some third party not before the court." Crawford v. United States Dep't of Treasury, 868 F.3d 438, 455 (6th Cir. 2017). If a third party is involved, however, "the allegation that a defendant's conduct was a motivating factor in the third party's injurious actions satisfies the requisite standard." Parsons, 801 F.3d at 714 (6th Cir. 2015) (holding that plaintiffs had standing over the FBI for designating their group as a gang, which motivated state authorities to violate their constitutional rights).

Here, Governor Lee argues that the Executive Order did not cause Plaintiffs to be harmed by increased COVID-19 exposure because (a) his Order did not force parents to opt their children out of wearing masks, and (b) LEAs are ultimately responsible for creating safe environments for students with disabilities, which the Executive Order did not prevent. (ECF No. 49 at PageID 468-69.)

Both Plaintiffs and the County dispute this causation argument. Plaintiffs argue that they have demonstrated a causal link between the issuance of Executive Order No. 84 and Plaintiffs' harms: before the Executive Order, Plaintiffs contend that they "felt comfortable sending their medically at-risk children to school" due to the mask requirement, but immediately in response

to the Executive Order, "G.S.'s mother[] testified that she pulled her son out of school for a week until they could try to obtain some reasonable modifications that would mitigate the danger Gov. Lee's order caused. As such, Plaintiffs have demonstrated a causal link." (ECF No. 29 at PageID 235.)

Second, in response to Governor Lee's allegation that LEAs – not the Governor – are to blame if schools are not providing safe environments for children with disabilities, the County asserts that "[t]he Governor ignores that under Title II of the ADA, a public entity," like a state government, "has an <u>affirmative</u> duty to make reasonable modifications in its policies and programs to avoid discrimination on the basis of disability." (ECF No. 57 at PageID 1207 (citing 28 C.F.R. § 35.130(b)(7)).) Additionally, by noting Defendant's own obligation as Governor to "to oversee the State's own agencies to protect individuals from violations of their rights," (<u>Id.</u>; <u>see also</u> <u>United States v. Texas</u>, 321 F. Supp. 1043, 1056-1057 (E.D. Tex. 1970), <u>aff'd</u> 447 F.2d 441 (5th Cir. 1971)), the County argues that any harm caused to children with disabilities, while in public school, by unmasked children with COVID-19 is traceable to the Governor's Executive Order.

Plaintiffs have sufficiently alleged that, without the Executive Order, parents could not have taken the "independent action" of opting their children out of wearing masks. The opt-out provision permitted parents to allow their children to attend school unmasked, which is borne out in Plaintiffs' schools. It is that unmasked presence that creates the danger to these Plaintiffs. Thus, Plaintiffs have established that their harms are fairly traceable to Defendant's conduct.

Moreover, Governor Lee's Executive Order was the catalyst for LEAs to be unable to provide this reasonable accommodation for students with disabilities. Indeed, instead of maintaining the "current status quo" of a masking mandate under Shelby County's Amended

18

Health Order, (see ECF No. 57 at Page ID 1208), the Governor eliminated this option and challenged schools to create more costly and complex measures to protect every child with a disability.  A reasonable accommodation would exist if the Executive Order did not, as there "is no allegation. . . that the LEAs [within Shelby County] would not otherwise follow" the County's health directives.  (ECF No. 57 at PageID 1208.)  But for the Governor's Order, schools in Shelby County would be able to comply (at least in this scenario) with the ADA and Rehabilitation's mandate to provide access to public institutions to individuals with disabilities. The injury is distinctly traceable.

       C.  <u>Administrative Exhaustion</u>

One of Governor Lee's primary arguments is that Plaintiffs' claims are foreclosed, because they did not exhaust administrative procedures under the IDEA.  Defendant argues that the claims of two named plaintiffs, G.S. and S.T., are governed by the Individuals with Disabilities Education Act (IDEA), and are therefore unable to be heard by this Court because G.S. and S.T. have not satisfied the IDEA's administrative exhaustion requirements.  Defendant concedes that Plaintiff J.M. does not fall under this same exhaustion requirement.  (ECF No. 53 at PageID 1159.)

Plaintiffs argue that all three named Plaintiffs' claims under the ADA and Rehabilitation Act do not require administrative exhaustion under the IDEA and thus are properly before this Court.  The Court agrees with Plaintiffs.

The IDEA offers federal funds to states in exchange for a commitment to provide a free appropriate public education ("FAPE") to all students, including services that provide "instruction to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction."  <u>Fry v. Napoleon Cmty. Sch.</u>, 137 S. Ct. 743, 748-49

(2017). A FAPE is still available under the ADA and Rehabilitation Act, but, as Commissioner Nicholls explained, "what sets the IDEA apart" from other statutes protecting the rights of students with disabilities to a FAPE "is the need for specialized instruction" for children who qualify for protection. (ECF No. 53 at PageID 1111.) When a plaintiff is seeking relief that is available under the IDEA, even if the plaintiff "proceed[s] under the auspices of the ADA [and] the Rehabilitation Act," he is required to exhaust administrative procedures and remedies before proceeding with other claims. Sagan v. Sumner Cty. Sch. Bd., 726 F. Supp. 2d 868, 880 (M.D. Tenn. 2010). In other words, when a plaintiff does not fully pursue these administrative remedies for a claim available under the IDEA, "he also gives up his right to 'seek relief for the denial of an appropriate education' under other federal laws." Perez v. Sturgis Pub. Sch., 3 F.4th 236, 240 (6th Cir. 2021) (quoting Fry, 137 S. Ct. at 755). However, "if the remedy sought is not for the denial of a [FAPE], then exhaustion of the IDEA's procedures is not required." Fry, 137 S. Ct. at 754.

To determine whether a plaintiff is seeking relief for the denial of a FAPE and is therefore required to exhaust IDEA's procedures, Fry instructs courts to "look to the substance, or gravamen, of the plaintiff's complaint." Id. at 752. Thus, the Court's analysis begins by considering the complaint itself, and then focuses on answering two hypothetical questions posited by the Supreme Court in Fry. Finally, the history of proceedings in the case is important, including consideration of whether a plaintiff previously invoked IDEA in an effort to address their dispute. Id. at 757. Following this process, the Court concludes that Plaintiffs are not seeking a FAPE, thus rendering administrative exhaustion inapplicable.

1.  Complaint

When reviewing a complaint for whether it seeks a FAPE, courts must first attend to the

distinctions in the statutes at play.  "In short, the IDEA guarantees individually tailored

educational services, while Title II and § 504 promise non-discriminatory access to public

institutions." Fry, 137 S. Ct. at 756.  Governor Lee argues that this Amended Complaint, in

substance, involves Plaintiffs' right to a FAPE; Plaintiffs argue that the Amended Complaint, in

substance, involves Plaintiffs' right to access their education and educational institutions.  The

Court agrees with Plaintiffs.

Plaintiffs state that their children's inability to attend school safely has impacted their

education, (see ECF No. 54, ¶ 35-37), which could be read as a full denial of a free and

appropriate education.  But if one takes a step back and analyzes why Plaintiffs' education was

interrupted, it is due to Plaintiffs' inability to access their educational environment.  While these

named Plaintiffs have varied educational needs – requiring significant variation in educational

services – their claim does not rest on what services do or do not suffice.  Instead, the Amended

Complaint alleges that Plaintiffs are school-aged children with disabilities within Shelby County

who share a common, heightened vulnerability to the effects of COVID-19 if exposed.  They

cannot even walk into or within the building in a manner that is equal to their non-disabled

counterparts.  Much like in Fry, where a student with a therapy dog sought the dog's assistance

in her classroom, and whose claim was not found to require exhaustion under the IDEA,

Plaintiffs' health risks are not related to an education that is substandard or not "appropriate".

(ECF No. 53 at PageID 1110 (Assistant Commissioner Nicholls describing that "the A in FAPE,

the appropriate is something that is really the individualized piece.  What is appropriate for one

child may not be appropriate for another.").)  The testimony offered makes clear that the quality

of Plaintiffs' education – whether assisted by an IEP or not – would suffice if the children were able to be in the classroom, hallway, their PE classes, or in the cafeteria, because everyone wore masks which thus protected them from COVID-19 exposure.  However, based on their disabilities and their vulnerabilities, the Amended Complaint alleges that, under the Executive Order, Plaintiffs cannot attend school without exposing themselves to the severe risk that their unmasked classmates pose to their health – and their parents are forced to decide whether to keep these students home, or place them at risk.  (ECF No. 54 at PageID 1175-76.)  Thus, the Amended Complaint seeks to enjoin the Executive Order to allow Plaintiffs to <u>attend</u> school safely again to learn, as well as to learn safely.

The testimony from Assistant Commissioner Nicholls helps to illustrate why Plaintiff J.M.'s claims as asserted in the Amended Complaint are not governed by the IDEA.  She stated that "the academic or behavioral <u>performance</u> of a child would trigger the evaluation under IDEA."  (ECF No. 53 at PageID 1141.)  Contrast these situations with children who have medical disabilities or other disabilities that do not require specialized instruction, such as diabetes, sickle cell anemia, asthma, or immunocompromisation, and thus they do not need evaluations under the IDEA unless there was a negative impact on the child's education from such disability.  (<u>Id</u>.)   While these disabilities could still trigger an evaluation under Section 504 of the Rehabilitation Act if the disability limited access to the student's educational environment, the IDEA would not be implicated because these disabilities do not affect how children must receive educational instruction.  (<u>Id</u>.)  As a result, "disabilities that result in a need for reasonable accommodations to access a classroom. . . [i]f they don't require specialized instruction," are not covered under IDEA.  (<u>Id</u>.)

While G.S. and S.T. are recipients of specialized instruction, J.M. does not require these special educational services, and is therefore ineligible for an IEP or relief under the IDEA. (See ECF No. 42-1 at PageID 316.) Indeed, the Governor concedes that J.M.'s claims are separate from the IDEA. (ECF No. 53 at PageID 1159.) However, regardless of eligibility for an IEP, all three Plaintiffs seek the same relief in their Amended Complaint. This plea for common relief drives home that the "crux" of their collective complaint is the opportunity to seek access to the educational environment.

### 2. <u>Fry</u>'s Questions

<u>Fry</u> offers two hypothetical questions that operate as a "clue" when a court must determine the gravamen of complaint, specifically: (1) whether the plaintiff could have brought essentially the same claim if the conduct occurred at a public facility that was not a school; and (2) whether an adult at the school could have pressed essentially the same grievance. <u>Fry</u>, 137 S. Ct. at 756.

While Governor Lee does not fully concede the answer to either question, he suggests that answering these questions "may not be perfectly applicable in every context due to the overlapping coverage of the relevant statutory schemes." (ECF No. 49 at PageID 465.) Instead, Governor Lee argues that the third inquiry, consideration of the history of the proceedings, may be more relevant. Plaintiffs, on the other hand, continue to argue, as they did in the TRO Hearing and filings, (see ECF Nos. 2, 28, 29), that the answer to both questions is "yes."

As discussed in the Court's TRO Order,[6] the Court answers "yes" to both questions. Each Plaintiff could have brought the same claim for access to a public facility that was not a

---

[6] The Court provides a longer description of the facts and analysis from <u>Fry v. Napoleon Cmty. Sch.</u>, 137 S. Ct. 743 (2017) and <u>Perez v. Sturgis Pub. Sch.</u>, 3 F.4th 236 (6th Cir. 2021) in the

school, if a similarly critical service was being obtained there and the Governor's opt-out provision applied.  For instance, G.S. could have a need to attend a form of therapy at a public gym, or S.T. could need to access the public library that could only be obtained with protection from exposure to COVID-19.  If others at those facilities could opt out of masking, neither Plaintiff could access these facilities.  Similarly, a teacher with similar health concerns within a school setting could raise a reasonable accommodation claim if she needed to be protected from unmasked children.  As such, the gravamen of Plaintiffs' complaint is not to seek a FAPE, but rather to seek "non-discriminatory access" to their public schools by way of a reasonable accommodation.  Fry, 137 S. Ct. at 756.

### 3.   History of Proceedings

Finally, as for the history of the proceedings, a  plaintiff's initial attempt to resolve an issue through the IDEA process could suggest that the suit seeks relief for the denial of a FAPE. Fry, 137 S.Ct. at  n.10.  While attentive to the fact that two named Plaintiffs do have IEPs and one affirmatively initiated changes under an IEP after the Executive Order was issued, the Court concludes that the Amended Complaint as a whole does not involve claims under the IDEA.

Arguing that the IDEA exhaustion requirement applies here, Governor Lee points out that Plaintiffs G.S. and S.T. did have IEPs, (ECF No. 28 at PageID 1057, 1066-69), and G.S.'s mother requested "an emergency IEP" based on the Executive Order to try to satisfy her child's needs."  (Id. at PageID 1066.).  Governor Lee argues that this initial pursuit of IDEA's administrative remedies normally "provide[s] strong evidence that the substance of [Plaintiffs']

---

TRO Order.  For judicial economy, the Court relies on that fact-specific analysis of these cases, but will not repeat it here.

claim concerns the denial of a FAPE[.]"  (ECF No. 49 at PageID 467 (quoting <u>Fry</u>, 137 S. Ct. at 757.)

Plaintiffs respond that, even if Plaintiffs G.S. and S.T. have IEPs, their claim in this lawsuit is unrelated.  Further, Plaintiffs note in their Reply to Defendant's Response to Plaintiffs' Motion for Preliminary Injunction that J.M, who is also a named Plaintiff and constituting part of the same proposed class, not only does not qualify for an IEP, but also has not attempted to seek accommodations through that process.  (ECF No. 42-1.)

The history of these proceedings for two Plaintiffs does not capture the full thrust, or crux, of what Plaintiffs are seeking.  Although one Plaintiff sought partial relief under the IDEA, the fact that that process could not address the issue at hand is instructive.  Moreover, the inclusion in Plaintiffs' proposed class of "thousands of children who are not eligible for any relief under IDEA's provisions because they are not 'a child with a disability' within the meaning of 20 U.S.C. § 1401(3)," and who are not seeking ongoing, individualized educational support, further supports the conclusion that this matter is not based in the IDEA.  (<u>See</u> ECF No. 53 at PageID 1131 ("the biggest difference between a student covered under the ADA alone and not under the IDEA would be a student who doesn't require specialized instruction . . . as a result of their disability.").)  Governor Lee is accurate that no two IEPs are the same because they involve a child's individualized special education needs.  But all three plaintiffs' claims here, and the sought-for relief among the entire putative class, <u>are</u> the same, regardless of their varied educational abilities or needs.  (<u>See id.</u> at Page ID 1141 (Commissioner Nicholls agreeing that "disabilities that result in a need for reasonable accommodations to access a classroom . . . aren't covered under IDEA . . . [if] they don't require specialized instruction.").)    They all seek a

reasonable accommodation that the Governor has taken off the table.  Consequently, IDEA exhaustion is not required.

## II.      Irreparable Harm Shown

The factor of irreparable harm appears to be uncontested by Defendants at this stage, and Plaintiffs have satisfied their burden of showing that irreparable harm will result if the Governor's Executive Order remains in place.  In their Motion, Plaintiffs describe the situation in schools already caused by the Executive Order – that "school has been in session for more than 3 weeks, a significant number of the student body has already opted-out of the county-wide mask mandate, and the number of students infected with COVID-19 or exposed, warranting quarantine continues to rise," – and that "[w]ithout the ability to implement a universal mask mandate, Plaintiffs will continue to be exposed to an increased risk of infection, hospitalization, or death because of COVID-19, or they will be forced to stay home and denied the benefits of an in-person public education."  (ECF No. 2-1 at PageID 41.)  As Plaintiff Brittany Schwaigert stated, "[n]o parent should be put in a position of having to choose, like we have with G.S., between educating their child and the health of their child" – yet this is the untenable and harmful position that the Executive Order has foisted upon disabled children and their parents, a position that will continue as long as the Executive Order is enforced.  (ECF No. 2-2 at PageID 45.)

## III.     No Substantial Harm Caused to Third Parties, and Injunctive Relief in Public Interest

The third and fourth preliminary injunction factors to consider – the balance of the equities and the public interest— "merge when the Government is the opposing party."  Nken v. Holder, 556 U.S. 418, 435 (2009).

Plaintiffs contend that these factors are satisfied because the public interest is served both by protecting public health and by enforcing the ADA.  (See ECF No. 2-1 at PageID 42-43.)

Further, Plaintiffs also argue that no harm would be caused, "other than the potential dissatisfaction of some members of the public."  (Id.)

However, Governor Lee argues that, when issuing the Executive Order, he "aimed to balance important interests: the fundamental right of parents to raise their children, including directing their education; the interest of school districts to decide what is best for their schools; and the interest in providing in-person, public education."  (ECF No. 49 at PageID 473.)  Given these interests, Lee alleges that exempting Shelby County in particular would "upset the balance struck by the Executive Order," and "intrude on the Governor's authority and discretion to manage COVID-19 and other emergencies."  (Id.)

Although courts must be circumspect and hesitant to wade into the policy choices of other branches of government, state and federal, here the proof shows that Plaintiffs are seeking non-discriminatory treatment, and thus to not be subject to a violation of the law, which is in the public interest and will not harm third parties.  Moreover, "[s]ociety benefits by stemming the proliferation of COVID-19, thereby 'flattening the curve,' preventing strain on medical centers and hospitals, and ultimately reducing death or long-term injury from COVID-19-related lung damage."  Perez-Perez v. Adducci, 459 F. Supp. 3d 918, 931 (E.D. Mich. 2020); see also Neinast v. Bd. of Trustees, 346 F.3d 585, 592 (6th Cir. 2003) (recognizing public health and safety as legitimate government interests); see also Thakker v. Doll, 451 F. Supp. 3d 358, 372 (M.D. Pa. 2020) ("Efforts to stop the spread of COVID-19 and promote public health are clearly in the public's best interest").

As to the Governor's alleged harm caused by enjoining the Executive Order, it is no doubt critical that Governor Lee maintain his ability to manage emergencies, as provided under Tenn. Code. Ann. § 58-2-107.  Further, exempting one County from enforcement of a state-wide

provision is no small matter.  However, in Governor Lee's analysis of what is best for providing

in-person, public education, he eliminates school districts' ability to impose a mask mandate if

one is necessary and ignores what the Shelby County Health Department has determined is best

for providing in-person, public education <u>safely</u> in this County.  Without consulting his own

education experts on the needs of children with disabilities and going against the public health

guidance of local and national medical and public health entities, Governor Lee took an action

that adversely affected the right of disabled children to access public education.  The public

interest certainly recognizes the rights of parents, but a universal masking requirement to protect

students' health does not significantly impact their ability to direct their education any more than

would a uniform policy or requiring that students receive certain vaccinations before attending

school. The Court concludes that the harm from enjoining enforcement of the Executive Order is

not negligible, but the harm to the public if the Executive Order were to remain in effect is much

more drastic.  Public interest is served by an injunction.

## IV.     Conclusion

Based on the above analysis, the Motion for Preliminary Injunction is **GRANTED**.

Because the purported class has not yet been certified and could implicate certain claims before

the Court, the Court notes that the preliminary injunction could be reevaluated if the class is not

fully certified.

**IT IS THEREFORE ORDERED THAT**:

1.     Defendant Governor Lee is **ENJOINED** from enforcing Executive Order No. 84

in Shelby County or allowing parents to opt out of Defendant Shelby County's

mask mandate, as currently specified under Shelby County Health Order No. 25.

2.     Defendant Shelby County is **ORDERED** to enforce its Health Orders without exception for Governor Lee's Executive Order No. 84.

3.     The Court is entering this Order to prevent further injury, damage and loss to Plaintiffs.

4.     This Preliminary Injunction shall remain in effect until a final order is entered in this case unless dissolved sooner by order of this Court.

**IT IS SO ORDERED,** this 17th day of September, 2021.


s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE